[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 789 
Land Energy, Ltd. ("LE"), brought an inverse-condemnation action against the Alabama Department of Transportation ("ADOT").[1] After court-ordered mediation was unsuccessful, the case proceeded to a jury trial. ADOT moved for judgment as a matter of law ("JML") at the close of LE's case and again at the close of all of the evidence. The trial judge denied both motions. The jury found ADOT liable for inverse condemnation and awarded LE $650,000 in compensatory damages; the court entered a judgment on the verdict. Pursuant to Rule 50, Ala.R.Civ.P., ADOT renewed its motion for a JML and moved, alternatively, for a new trial; LE responded to ADOT's motion, and also filed a motion to have the trial court take judicial notice of certain deeds in its chain of title to the condemned property. In an order entered November 8, 2002, the trial court declined to take judicial notice of the requested documents to the extent requested by LE and denied ADOT's renewed motion for a JML or for a new trial; that order stated, in pertinent part:
"MOTION TO TAKE JUDICIAL NOTICE
 "[LE] moved for the Court to take judicial notice of certain certified public records *Page 790 
consisting of real property deeds filed in the Probate Court of Marion County, Alabama.
". . . .
 "Inasmuch as there was no evidence presented at trial of any special covenant in the deeds showing [LE's] chain of title and rights, the Court will only accept the certified deeds as being true and correct copies of public record but does not take judicial notice of them for adjudicative purposes.
". . . .
 "MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL
". . . .
 "[ADOT] again argues that there was no taking of [LE's] property. Ala. Code, § 18-1A-3(16), defines property, in part, as an interest in real property. Under the commentary to this section, the terminology `an interest' in real property is to be given a broad interpretation so as to include such interests as subsurface rights. Furthermore, in Alabama, a mineral interest is considered to be real property. Dauphin Island Property Owner's Ass'n v. Callon, 519 So.2d 948 (Ala. 1988); Nelson v. Teal, 293 Ala. 173, 301 So.2d 51 (1974).
 "Clearly, the `taking' of a mineral interest constitutes the taking of real property. `Taking' of property occurs when one is denied the right of commercial use of its land or, as here, the right to mine its coal. See Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); Pennsylvania Coal Company v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).
 "The issue of whether or not there was a `taking' was a fact for the jury to decide. The jury obviously found that there was a taking of property for which [LE] was entitled to just compensation. That there was a taking of property was supported by the undisputed evidence that [LE] is now unable to access the coal.
 "[ADOT] also argues that [LE's] evidence [as to the] method of valuation should not have been allowed and that the Court improperly charged the jury on damages. More specifically, [ADOT] argues that pursuant to Ala. Code § 18-1A-170(b), compensation should be based on the `fair market value of the entire property before the taking and the fair market value after the taking.' However, this rule is only applicable when there is a partial taking and the property is acquired by eminent domain. § 18-1A-170(a), Code. Of course, this action was an inverse condemnation proceeding and the property of [LE] was not acquired by eminent domain and there was not a partial taking. Therefore, this Court is of the opinion that the provisions of § 18-1A-170 are not applicable to this case.
". . . .
 "[LE] does not [sell] its property, it leases mineral rights, which is usually a particular seam of coal for a certain period of time. The amount paid for the lease is determined by taking the number of tons of coal multiplied by the royalties. In this case, there was evidence of the standard minimum royalties received by [LE] for leasing its mineral rights to miners which is the standard practice used in the coal business to value coal. There was also evidence of the amount of recoverable coal reserves on this property.
". . . .
 "Although there was no evidence as to the price of property offered for [sale] by a willing seller to a willing buyer, there was evidence of price, or value of *Page 791 
leases including royalties, that [LE] was willing to enter into with willing miners."
ADOT appeals. ADOT argues to this Court that it did not "take" LE's mineral estate, and, therefore, that its motion for a JML should have been granted, or, alternatively, that a new trial should be ordered because the trial court erred in various evidentiary rulings allowing or disallowing certain testimony or evidence. We affirm.
 I. Facts
ADOT needed to acquire certain rights in various parcels of privately owned property to complete a highway project known as Corridor X, designed to link Birmingham, Alabama, and Memphis, Tennessee. The parcel involved in this case contains approximately 120 acres and is located in Marion County, Alabama. The "Pearce Estate" owned the surface of the land; LE, an investment group that owns property consisting of both surface land and mineral rights, owned the mineral estate to the 120 acres. LE's mineral estate, which the parties stipulated contains 374,000 tons of surface coal, is the subject of this dispute.
ADOT hired Dr. Henry McCarl, a licensed geologist and the owner of a geological consulting firm, to investigate whether the recovery of the coal contained within LE's mineral estate was economically feasible. Dr. McCarl went to the area, took measurements and studied data contained in various "drill logs," and then reported that there was coal under the surface but that it was not economically recoverable. Based on that report, ADOT elected to acquire only the surface rights to a portion of the property owned by the Pearce Estate, specifically the surface rights to 34.08 acres of the 120-acre tract, through a condemnation action filed September 23, 1999, forgoing any attempt to condemn LE's mineral estate. ADOT ultimately paid the Pearce Estate $31,000 for the condemned surface acreage. LE was aware of the proposed Corridor X, but did not know the route ADOT had planned for it. ADOT had obtained permission from Howard Graham, LE's property manager, some four or five years before the September 1999 condemnation action, "to go on" or "cross" the Pearce Estate's land to conduct core-drilling operations. ADOT never informed LE of the results of those drilling operations or that the condemnation action had been instituted. The first time LE became aware that Corridor X would cross a portion of the 120-acre tract was when Graham and John Oliver, an owner of LE, were touring the property in February 2000 and saw construction of the highway underway. LE then asked ADOT if it could get permission for a mining company to remove the coal on the property before the highway was completed. That request was refused.
The only disputed issues presented to the jury were whether by condemning the 34.08 acres ADOT had "taken" LE's coal reserves, i.e., (1) whether those reserves were economically recoverable, (2) whether the surface owner would have consented to surface mining, and, (3) if there was a taking, what compensation LE was due based on the value of those reserves.
 II. Standard of Review "When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). In an action filed after June 11, 1987, the nonmovant must *Page 792 
present substantial evidence to withstand a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992)."
Ex parte Alfa Mut. Fire Ins. Co., 742 So.2d 1237, 1240 (Ala. 1999).
 "[T]he ruling on a motion for new trial is within the discretion of the trial court[,] and . . . the trial court's decision carries a strong presumption of correctness. Gold Kist, Inc. v. Tedder, 580 So.2d 1321, 1322 (Ala. 1991). The decision of the trial court should not be disturbed on appeal unless the record plainly and palpably shows that the trial court erred and that some legal right has been abused."
McBride v. Sheppard, 624 So.2d 1069, 1070-71 (Ala. 1993). Moreover, the standard this Court applies in reviewing the trial court's rulings on evidentiary matters is to determine whether the trial court exceeded its discretion. Crest Constr. Corp. v.Shelby County Bd. of Educ., 612 So.2d 425 (Ala. 1992).
 III. Analysis
ADOT first argues that its acquisition of the property owned by the Pearce Estate did not constitute a "taking" of the mineral estate. Describing the State's power of eminent domain, Ala. Const. Art. I, § 23, requires that any taking of private property by the State be compensated:
 "That the exercise of the right of eminent domain shall never be abridged nor so construed as to prevent the legislature from taking the property and franchises of incorporated companies, and subjecting them to public use in the same manner in which the property and franchises of individuals are taken and subjected; but private property shall not be taken
for, or applied to public use, unless just compensation be first made therefor. . . ."
(Emphasis added.) Generally, the State's exercise of the power of eminent domain is accomplished through the statutorily regulated process of condemnation. See, e.g., State Dep't of Transp. v.McLelland, 639 So.2d 1370 (Ala. 1994). Section 18-1A-32(a), Ala. Code 1975, provides:
 "(a) If property is to be acquired by a condemnor through the exercise of its power of eminent domain, the condemnor shall commence a condemnation action for that purpose. A condemnor shall not intentionally make it necessary for an owner of property to commence an action, including an action in inverse condemnation, to prove the fact of the taking of his property."
This Court stated in Ex parte Carter, 395 So.2d 65, 67 (Ala. 1980), "[i]nverse condemnation is defined as the taking of private property for public use without formal condemnation proceedings and without just compensation being paid by a governmental agency or entity which has the right or power of condemnation."
If the owner of a mineral estate does not own the surface land, the owner of the mineral estate must obtain permission from the surface owner to disturb the surface in order to mine the minerals. See *Page 793 Bibby v. Bunch, 176 Ala. 585, 589, 58 So. 916, 917 (1912). As noted, ADOT refused LE permission to mine the coal within the acquired right-of-way. Also, the parties agree that an applicable regulation of the Alabama Surface Mining Commission in the Alabama Administrative Code forbids mining "[w]ithin 100 feet measured horizontally, of the outside right-of-way line of any public road." Reg. 880-X-7B-.06(4). There was ample testimony before the jury indicating that the combined effect of the condemnation of a portion of the Pearce Estate property and the 100-foot "set back" provision was that LE will never be able to access any of the coal. Therefore, LE asserts, ADOT has effectively "taken" the entire of its mineral estate.
Because the trial judge's instructions to the jury at the conclusion of the trial are so important to our resolution of this appeal, we set out the following fairly lengthy excerpts from those instructions, representing the portions pertinent to the substantive issues involved here:
 "Now, some of the facts are not in dispute. For example, it's undisputed that the State condemned the surface land to the property in issue, but not — did not condemn the mineral interest in the land. However, there are issues for you to decide. And one of them is whether there was a taking of [LE's] property. And if so, the amount of just compensation to be awarded. I'm going to back up a little and start with condemnation, although, this is really an inverse condemnation. But for background, eminent domain is the right of the State or of those to whom the power has been delegated to take private property for public use without the owner's consent and to appropriate ownership and possession of the property upon payment of just compensation.
 "Now, condemnation is a legal proceeding and it's begun in probate court to acquire private property for a public use. And when property is to be acquired by a government entity, the condemner shall commence a condemnation action for that purpose. And before commencing a condemnation action, the property should be appraised to determine the amount that would constitute just compensation for the taking. And the owner should be given a reasonable opportunity to accompany the appraiser during the inspection of the property.
 "Furthermore, a condemner shall not intentionally make it necessary for an owner of property to commence an action including an action for inverse condemnation to prove the fact of the taking of the property.
". . . .
 "Inverse condemnation is the appropriate remedy if there is a taking of private property interest for public use by the government and there has been no formal condemnation proceeding and just compensation has not been paid by the government.
". . . .
 "Now, the first issue, really, for you to decide is whether or not there has been a taking. And you may find that a taking occurred if you find to your reasonable satisfaction that the State of Alabama, by its acquisition of the surface above the mineral estate of [LE], improperly prohibited [LE] from being able to recover its own coal. And in Alabama, a coal miner may not legally mine coal by going through the surface of the earth unless he or it has the permission of the surface owner to do so. And the State of Alabama has the same rights and liability of ownership and use of its property as private individuals have. *Page 794 
 "Now, if you find to your reasonable satisfaction that the State of Alabama, by acquiring the surface, did not take [LE's] mineral rights in the land, that would end your deliberation.
 "However, if you find to your reasonable satisfaction that the State of Alabama, by acquiring the surface above the mineral estate of [LE] improperly foreclosed the possibility that [LE] could recover its minerals, then it would be your duty to determine damages.
 "Damages in this type of case, the measure of damages is called just compensation. And it is the payment of such sum of money to the owner of the property so that he would be saved harmless as near as may be and put in as near the same condition as he would have been in but for the taking.
 "And with regard to the amount of compensation as to that issue, neither [LE] nor the defendant has the burden of proof as to the compensation issue. The amount of just compensation, if any, to be awarded is in your good sound discretion based on the evidence presented and the law that applies.
 "Now, a landowner is entitled to recover the reasonable market value of the property taken as of the date of the taking. And in determining what is just compensation, it is your duty to determine the fair market value of [LE's] mineral interest as of September 23, 1999. And that's required by law, and that's the date the application for order of condemnation was filed in the probate court in Marion County.
 "Various terms have been used. And the terms, reasonable market value, cash market value, fair market value, are considered substantially the same. Fair market value is defined as the price the property would bring when offered for sale by a willing seller who is not forced to sell and which is sought by a willing buyer, who is not required to buy after due considerations of all elements affecting value.
 "In determining just compensation, you make take into consideration the value of the land taken, the actual acreage taken, any entry to the remaining part of the tract of land, and the adaptability of the land for a special purpose affecting its value.
 "You may also consider the use to which the property is reasonably adapted, though, the property is not presently so used, as [LE] is entitled to have the value of the property determined and based on its highest and best use. If you are reasonably satisfied that there existed a prospective use affecting the value of the property on September 23, 1999, that is an element for your consideration. However, you should not consider speculative or imaginary uses of the property or merely speculative plans of [LE].
 "And as to any diminished value, the proper way to arrive at the diminished value of the tract of land is the difference in market value just before and just after the taking. These other elements are factors that you may use and take into consideration at [sic] what would be just compensation.
 "And, finally, if there's a partial taking, the valuation is the difference between the fair market value of the entire property before the taking and the fair market value of the remainder after the taking."
At the conclusion of the charge the only objections stated by ADOT were as follows:
 "We would object to the giving of the details of condemnation, because it unduly emphasizes the facts in this case that the State of Alabama did not give *Page 795 
. . . notice [to LE]. It being the position that the State did not have to give notice to what it did not take.
 "It — I also object to the giving of the charge out of the Code that says that the State of Alabama shall not intentionally fail to condemn and require the landowner to file an inverse condemnation proceeding because that — that should not enter into the damages in this case and —
". . . .
 "— and unfairly prejudices the State in that respect.
"I also object to the giving of [LE's charge] No. 5 —
". . . .
 "— because, if taken in context, it indicated to the jury that — it did not indicate to the jury, at that place, that it hada — an opportunity to find less thana — a total taking.
 "Then, I would object to the — as the Court referred to in the requested instruction No. 4 and No. 8, that the defendants requested — we believe that the word unlawfully should have been used instead of improperly.
 "We object to the failure to give charge No. 5 as written. I know that the Court did its version of that, but I believe it failed to give all of the aspects that the requested charge requested, and I object to the failure to give 5A, the handwritten charge that was submitted earlier.
 "There was one other place where the Court talked about value and — and that was in charge No. 8 as requested by [LE]. The Court left off the words, if any, which, in the context of that charge, unfairly prejudiced the State."
Any portion of the jury charge to which ADOT did not object became "the law of the case."
 "Unchallenged jury instructions become the law of the case. Louisville Nashville R.R. v. Atkins, 435 So.2d 1275 (Ala. 1983). The jury is bound to follow such instructions, even if they are erroneous. Lee v. Gidley, 252 Ala. 156, 40 So.2d 80 (1949) (erroneous instructions became the law of the case, and a judgment entered on the jury verdict comporting with those instructions would not be reversed on appeal). `A verdict contrary to [the court's instructions] would have to be set aside on motion' of the prejudiced party. New Hampshire Fire Ins. Co. v. Curtis, 264 Ala. 137, 142, 85 So.2d 441, 446
(1955)."
Clark v. Black, 630 So.2d 1012, 1017 (Ala. 1994) (footnote omitted).
 "As to whether the trial court erred in its instructions concerning [a particular issue], we note that the defendants neither objected to the trial court's oral charge in this respect nor submitted any requested written instructions to the trial court dealing with the matter. There is no ruling by the trial court for us to review on the issue . . . and the trial court's oral charge became the law of the case. Alfa Mutual Insurance Co. v. Northington, [561 So.2d 1041 (Ala. 1990)]."
Fraser v. Reynolds, 588 So.2d 442, 446-47 (Ala. 1990) (footnote omitted).
Rule 51, Ala.R.Civ.P., provides, in pertinent part:
 "No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless that party objects thereto before the jury retires to consider its verdict, stating the matter objected to and the grounds of the objection." *Page 796 
A general objection to the giving of, or the refusal to give, a jury instruction, not accompanied by an adequate explanation of the thrust of the ground, is insufficient to preserve any error associated with the giving, or refusal, of the charge. Vaughanv. Oliver, 822 So.2d 1163 (Ala. 2001); Waites v. Malone,658 So.2d 396 (Ala. 1995); Alfa Mut. Ins. Co. v. Northington,561 So.2d 1041 (Ala. 1990).
Also, at the appellate level, an objection to a jury charge not argued in an appellant's brief is deemed waived; an appellate court considers only issues argued in the appellate brief.Lowery v. Stinson, 291 Ala. 415, 282 So.2d 244 (1973).
In its principal brief on appeal, ADOT argues first that the jury charge was flawed because it discussed "the details of condemnation procedure, including the charge based on Ala. Code §18-1A-32 (1997)."[2] The trial judge explained to the jury that it gave the details of the condemnation procedure "for background" and emphasized that the claim at issue was an inverse-condemnation claim. ADOT objected to the portion of the charge paraphrasing § 18-1A-32(a), solely on the ground that a consideration of that Code section "should not enter into the damages in this case and [that the court's paraphrasing of it] unfairly prejudice[d] the state in that respect." Therefore, ADOT cannot now be heard to say that that portion of the charge was prejudicial as to the separate issue whether there had been a taking. Moreover, ADOT does not explain how it was prejudiced as a result of the trial court's giving this charge. See Rule 45, Ala.R.App.P.
Concerning the charge, ADOT next argues that the trial court erred in instructing the jury that it might find that a taking had occurred if it found that ADOT "by its acquisition of the surface above the mineral estate of [LE] improperly prohibited [LE] from being able to recover its coal" (emphasis added by ADOT), contending that the adverb should have been "unlawfully." It is ADOT's position in its principal brief that use of the term "improperly" without providing any definition left the jury "with no guidance how to resolve this issue." In its reply brief, ADOT expands on this argument to say that "`improperly' is much broader than the `unlawfully' as requested by ADOT," and that, regardless of which term was used, "the term must be defined for the jury to comprehend what it is asked to do." ADOT argues that it "made that request and it was refused," referencing the page of the record where its requested charge "5A" appears. That charge would have told the jury that "[i]n the context of this case unlawful means such actions as would make a similarly situated private surface owner liable to [LE] in damages." We do not consider a definition of "unlawful" predicated solely on actions that would make a private party civilly liable in damages to be an accurate definition.
The above is the extent of ADOT's arguments to this Court concerning perceived errors in the jury charge. ADOT presents no arguments as to the other objections it made to the charge at trial. Therefore, the trial court's jury charge, as excerpted above, bound the jury and narrows our analysis of the issues.
Under the governing "law of the case," it was exclusively within the province of the jury to determine whether there had been a "taking," which could be found to have occurred if the jury concluded that *Page 797 
ADOT had "improperly prohibited [LE] from being able to recover its own coal." If the jury found to its "reasonable satisfaction" that ADOT, by acquiring the surface property, had "improperly foreclosed the possibility" that LE could access the coal on that property, it could have found that a taking occurred. It would then be the jury's duty to determine damages. Detailed instructions were given concerning approaches for determining damages. The jury was told to look to the "difference in market value just before and just after the taking," which the parties stipulated was September 23, 1999, if a taking was found to have occurred. The jury was to consider "the use to which the property is reasonably adopted, though the property is not presently so used." The jury was told that LE was "entitled to have the value of the property determined on its highest and best use," although not a merely speculative or imaginary use.
ADOT argues that the trial court erred in denying its motion for a JML, because, it argues, "the trial court heard no evidence that justified allowing the jury to determine whether or not a taking had occurred." ADOT goes on to state that
 "there are two distinct kinds of taking: physical takings and regulatory takings. A physical taking requires a physical invasion or occupation of the property or that the owner be otherwise dispossessed of the property. A regulatory taking occurs where the owner retains the property, but its use is now regulated to such a degree that it is the legal equivalent of a taking. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)."
ADOT further asserts that the "takings jurisprudence of the U.S. Supreme Court has recognized two types of compensable regulatory takings: Categorical and partial." It contends that a categorical taking is one in which all economically viable use, meaning all economic value, has been absorbed by the regulatory imposition. By process of elimination, it concludes that the alleged taking in this case must be analyzed as a "partial" taking that is "regulatory in nature" because LE's claim, which relates only to "a portion of the mineral estate, i.e., the surface mineable coal, prevents any conclusion that a categorical taking of the 120-acre mineral estate occurred." Thus, in accordance with the legal position ADOT has staked out, this Court must consider whether there was substantial evidence from which the jury could reasonably have concluded that either a full or a partial taking occurred. Citing Penn Central TransportationCo. v. City of New York, 438 U.S. 104, 130-31, 98 S.Ct. 2646,57 L.Ed.2d 631 (1978), ADOT argues that "[t]he point at which regulation becomes a partial taking does not present a bright line test, but rather an ad hoc balancing test focused on (1) distinct investment backed expectations, (2) the nature of the government action, and (3) the economic impact on the property owner."
In its initial motion for a JML, ADOT argued that there was no proof that there had been a "categorical taking," because, it said, there was no proof that ADOT had taken all value from the mineral interest or that the State had assumed a position that encumbered the mineral interest more than it was encumbered by the previous owner. ADOT cited Penn Central, supra, for the proposition that a regulatory taking must be so intrusive, based on reasonable investor-backed expectations, that it is tantamount to taking all of the estate in question. ADOT asserted that, because it took only 34 acres, leaving 86 acres of the 120-acre tract, that standard was not met. ADOT argued that because the Pearce Estate "had no obligation to allow mining *Page 798 
of the property under it," ADOT had no more obligation to allow mining than had the Pearce Estate. At the close of all the evidence, ADOT renewed its motion for a JML, asking the court to consider the motion "along with the authorities and arguments which [ADOT] submitted with [its] trial brief." At the hearing on postjudgment motions, which the trial court conducted on October 16, 2002, ADOT renewed its motion for a JML but stated that it would "not propose to go through [the] written motion."
In its trial brief, ADOT made the following assertions:
 "[LE's claim] essentially, is that there was a `regulatory taking'; a change in condition that prevented the plaintiff from exploiting its resource.
 "The factual issue is essentially this: whether the State was correct in its assessment that the coal in the [LE] tract was not economically recoverable
even if [LE] could have obtained the legal right to mine it by surface methods. [LE] is expected to show by analogy that other tracts of coal with `similar' terrain and coal thickness and quality have been and are being mined. [LE] will show that the tract adjacent to [LE] was mined."
(Emphasis supplied.) With respect to "regulatory takings," ADOT referred in its trial brief to "a growing body of federal law involving the issue," citing six decisions of the United States Supreme Court, including Penn Central, supra; Lucas v. SouthCarolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886,120 L.Ed.2d 798 (1992); and Tahoe-Sierra Preservation Council, Inc.v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465,152 L.Ed.2d 517 (2002). Citing Lucas, ADOT now states to this Court that "[a] regulatory taking occurs where the owner retains the property, but its use is now regulated to such a degree that it is the legal equivalent of a taking." (ADOT's brief, at 41-42.)
In Penn Central, supra, the United States Supreme Court acknowledged that it had theretofore been unable to develop any set formula for determining when compensation for a regulatory taking was due from the government, explaining that the cases on point had engaged in "essentially ad hoc, factual inquiries." Among the factors prior caselaw had identified as having particular significance in the analysis was "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." 438 U.S. at 124, 98 S.Ct. 2646. In Lucas, the Court acknowledged that its caselaw had produced some "inconsistent pronouncements." 505 U.S. at 1016 n. 7,112 S.Ct. 2886. The Court pointed out that it had said on numerous occasions "[that] the Fifth Amendment is violated when land-use regulation . . . `denies an owner economically viable use of hisland.'" 505 U.S. at 1016, 112 S.Ct. 2886 (quoting Agins v. Cityof Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)) (emphasis added in Lucas). Tempering those statements, however, is the Court's observation that a state would not have to provide compensation even though its regulation deprived land of all economically beneficial use if the owner's estate was such "that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027, 112 S.Ct. 2886.
In Tahoe-Sierra Preservation Council, supra, the Court explained that "[t]he Penn Central analysis involves `a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.'" *Page 799 535 U.S. at 315 n. 10, 122 S.Ct. 1465 (quoting Palazzolo v.Rhode Island, 533 U.S. 606, 616, 121 S.Ct. 2448, 150 L.Ed.2d 592
(2001)). The phrase actually used in Penn Central was "distinct investment-backed expectations." Penn Central cited Goldblattv. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987,8 L.Ed.2d 130 (1962), as the source of this factor, but no phrasing similar to it is used at the page cited or anywhere else in theGoldblatt opinion. The relevant statements that appear on the page cited from Goldblatt are simply that "[t]here is no set formula to determine where regulation ends and taking begins"; that a "comparison of values before and after is relevant," but "by no means conclusive"; and that "[h]ow far regulation may go before it becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question" (footnote omitted).[3]
The specific terminology "distinct investment-backed expectations" originates in Penn Central, but is not defined in that opinion or any subsequent decision of the United States Supreme Court relating to regulatory takings. Penn Central does seem to employ that concept in its analysis, however, observing that the regulatory law in question "does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel" and that "[m]ore importantly," the law permitted Penn Central, the owner of the property, "not only to profit from [the property in question] but also to obtain a `reasonable return' on its investment." 438 U.S. at 136,98 S.Ct. 2646. ADOT argues to this Court that because LE knew that it did not own the surface rights when it acquired the mineral rights to the 120-acre parcel as a part of its overall purchase, and knew that it would have to obtain consent from the surface owner to conduct surface mining, LE had "[n]o basis for any reasonable expectation of a return on investment" for the mineral estate.
Analyzing ADOT's argument in the context of regulatory takings jurisprudence, to which ADOT has committed itself, we find the following testimony in the record to be relevant to LE's "reasonable expectation of a return on investment."[4]
(1) In 1989 LE acquired ownership of approximately 30,000 acres of mineral rights and 15,000 acres of surface rights in northwest Alabama, for a purchase price of $8,000,000. The 120-acre mineral estate at issue in this case was included in approximately 7,000 to 7,200 acres LE acquired located in Marion County, which was in turn included in the 30,000 acres.
(2) Howard Graham, LE's property manager, testified that when LE leased mining rights to a coal-mining company for extraction of the coal by surface mining, it received a specified royalty. The mining company would then have to obtain the right to surface mine from the surface owner. Based on his extensive experience in the coal-mining business, as detailed in the record, Graham was of the opinion that if Corridor X had not been proposed, and an agreement for surface-mining rights had been obtained, it would have been economically feasible to mine the 120-acre tract. He explained that it is the *Page 800 
responsibility of the mining company to obtain surface rights, and the standard lease used by LE required payment of a minimum royalty regardless of whether the miner was able to secure a surface lease. Graham was of the opinion that the coal reserve under the 120 acres was about 300,000 tons, which would translate to a royalty payment to LE by the miner of $720,000. Graham testified that LE does not actually conduct mining operations itself; rather, it sells timber and leases coal rights to the property it owns. Graham also testified that AmSouth Bank is the trustee of the Pearce Estate and that LE had never attempted to obtain surface rights on the 120 acres. Concerning the value of the ownership of coal reserves on property even where the surface rights have not been acquired from the surface owner, Graham explained that LE "received royalty payments on mineral interest that [it] own[s] now from lands on which a few years ago the surface wasn't available by any means. But people die and things change and surface rights become available. So those things change." He opined that so long as property is privately owned there is always an opportunity for somebody to lease it. In fact, Graham testified that the Pearce Estate had leased the surface rights it owned in property immediately adjacent to the 120 acres to a coal-mining company that has commenced surface-mining operations; those operations were ongoing at the time of trial.
(3) Phillip Eads, a certified public accountant employed by Lost Creek Coal Company, who participated in all of Lost Creek's lease negotiations, testified that Lost Creek had orally agreed to lease from LE the mineral rights under the 120 acres for a guaranteed amount of $50,000 per year and $2.40 per ton on the minerals. He testified that AmSouth Bank, as trustee of the Pearce Estate, was not approached at the time regarding leasing the surface because there was a timber lease on the acreage and the decision was made to wait until the timber had been harvested before approaching AmSouth. According to Eads, Lost Creek was sold before that came about, however.
(4) Steve Ingle, a professional engineer with extensive experience in coal mining, testified that the condemnation for the Corridor X project took only 34.4 acres of the 120-acre tract but "that did not include setbacks of any sort." He calculated that the 120-acre tract contained 354,000 tons of coal, of which, using the industry standard of 85 percent recovery, about 300,900 tons were recoverable. According to Ingle, the royalty return for the recoverable tonnage over the course of the two and a half to three years it would have taken to completely mine the tract, would have been $722,400. He explained that the area affected was much greater than the 34.4 acres actually condemned because, he stated:
 "In accordance with Alabama Mining Regulations, a coal miner must maintain 100 feet from the right of way of any public highway — especially an interstate system, such as what we're talking here. So that is — that's a no touch zone. An operator cannot get on that property whatsoever. That is a no."
(5) John Oliver, one of the owners of LE, testified that when the company purchased its holdings of some 30,000 acres of mineral rights and some 10,000 or 12,000 acres of surface rights, the "business plan, when [LE] acquired these properties, was to lease the coal rights — the mining rights to different coal companies" and to grow timber on the property for which LE held the surface rights, so it could pay the $8,000,000 debt. Oliver expressed the opinion that the value of LE's 120-acre *Page 801 
mineral estate as of September 1999 was "over $720,000."[5]
He testified that the two seams of coal under the 120-acre property extractable by surface mining qualify as "steam coal," which power companies use to generate electricity and for which there is a good market. Important to our analysis of whether the jury could have reasonably found from the evidence that LE's mineral estate represented a sufficient property interest or property-use interest so as to be susceptible of a taking is the following portion of Oliver's testimony:
 "Q. Do you have an opinion as to whether you would have been able to obtain the surface rights if the State had not condemned the Pearce Estate?
 "A. I feel certain we would have if we were — it's own[ed] by a trust department. They're the easiest people in the world to deal with, because they're under an obligation to lease and to realize the maximum income. They don't have any quarrel about Granny didn't want the coal mined or something. They have a duty to produce as much income as possible, so we love it when the surface is owned by a trust.
 "Q. And you understand that AmSouth Bank [has] actually leased on behalf —
"A. Oh, yeah.
"Q. — of Pearce Estate, the land —
 "A. As soon as the timber contract was expired, they were tickled to death to lease that land to coal operators.
 "Q. Do you base your opinion that the land has zero value now because about 40 acres of it are under Corridor X?
 "A. Yes, sir. And the rest of it can't be mined. They've chopped it up such that there's not an economical amount of coal left to mine."
On cross-examination, ADOT's attorney asked: "You expected, . . . if [ADOT] had not acquired a part of the Pearce Estate property that it would have brought to your coffer, $720,000?" Oliver answered, "I do. As soon as the coal — I mean the timber cutting contract expired."
(6) Roger Wilson, ADOT's right-of-way specialist for the district that includes the 120 acres, and "the guy here to talk for the State," testified at one point that although it had not been ADOT's policy before the Corridor X project not to notify owners of mineral interests of a condemnation of surface interests, that was the policy for the Corridor X project. Wilson said that, as to the 120 acres, the decision was made not to notify LE, based "on the advice of our geologist as to whether we make an offer for minerals or not." According to Wilson, ADOT knew that the Pearce Estate was the surface owner of the 120 acres but that LE owned the mineral interest. Wilson acknowledged that if ADOT had notified LE "then they would *Page 802 
have had the right to participate at the beginning," including the right to contest the taking and the right to have a commission appointed to meet with Oliver and listen to what he had to say about the property and its value, and then report its decision to the probate court. Wilson testified that notifying LE would have been "a good idea to let somebody know that they had a right," and would have been fair, just, and right. He explained that not notifying LE was "not [his] choice." According to Wilson, before the State filed its condemnation application for the surface rights, it had conducted test drillings by which it determined that two coal seams ran under the property. Wilson explained that ADOT retained Dr. McCarl to review all of the tracts along Corridor X in which "we thought there was any chance there would be minerals under." In any situation where it was determined that the construction "would likely encounter and interfere with [,] takeup coal from some owners," or "encounter and take coal on a tract," ADOT would offer the mineral owner a monetary consideration for the mineral rights and proceed to condemn the property if an agreement could not be reached. If Dr. McCarl reported that it would not be economic "to go after" the coal under a particular tract, ADOT would not make an offer to the mineral-interest owner. Thus, when Dr. McCarl's conclusion was that the construction of the highway project would not "encounter and take coal of the mineral owner," no offer was made. Questioned concerning the meaning of the terminology "encounter and take coal," Wilson testified:
 "A. When it's built that recovery is feasible then — and our geologists gives us a cost of what he thinks it will be, then we offer that to those mineral owners.
 "Q. All right. You're not just talking about when you run into coal building a highway, right?
"A. No. We know about it before that.
 "Q. All right. That's what I'm asking. You're not — you're talking about when you prevent someone from mining coal, am I right?
 "A. If — if they have a mine that's recoverable, then we would make an offer.
 "Q. All right. That's the question I was going to ask you. Regardless of the surface owner —
"A. Yes.
 "Q. — if they have not mined it and it is proved to be recoverable, the State feels like they should pay for it, am I right?
"A. That's right.
"Q. Okay."
Given the particular procedural and evidentiary posture of this case, and given the "law of the case" established by the jury instructions, we conclude that the jury was entitled to find that LE possessed an identifiable property-use interest before the condemnation. In that regard, one feature of the law of the case, binding on the jury, was the instruction that if it found to its reasonable satisfaction that ADOT "by acquiring the surface above the mineral estate of [LE] improperly foreclosed thepossibility that [LE] could recover its minerals," it would be the duty of the jury to determine damages.
The jury was presented with testimony from several qualified witnesses to the effect that the condemnation of the 34.08 acres of road right-of-way, combined with the resulting ban on mining operations within 100 feet of the outside right-of-way line, completely "landlocked" the remaining acreage of the 120-acre tract for mining purposes, rendering the 374,000 tons of coal reserves valueless. *Page 803 
Although there was testimony offered by ADOT contrary to some of the testimony recited above, under the applicable standard of review we must construe the record in favor of LE and look to see only if there is substantial evidence in the record supporting the jury's finding that a taking, as defined by the jury instructions, occurred.
Because ADOT has argued only that this case should be analyzed under principles relating to a regulatory taking, we need not consider other possibly pertinent "taking" concepts.
We discuss only briefly LE's argument that the trial court erred in not taking judicial notice of certain deeds filed as exhibits to its "motion to take judicial notice." LE argues that one of the deeds authorized surface mining without the consent of the surface owner. That deed was never introduced at trial, and its content was not otherwise communicated to the jury. As noted, the trial judge ruled that it would not take judicial notice of the deeds "for adjudicative purposes." LE has not cross-appealed that ruling. Thus, LE cannot in this appeal bolster its claim that the language of that deed conferred a property-use interest.
Having disposed of ADOT's claim that it is entitled to a JML, we turn to its alternative claim that the trial court should have granted its postjudgment motion for a new trial.
ADOT argues that certain charts, prepared by Dr. McCarl solely for use in the mediation, were wrongfully admitted into evidence at trial. ADOT relies on Rule 11, Ala.Civ.Ct.Med.R., which stated at the time the mediation was conducted, in pertinent part:[6]
"RULE 11: CONFIDENTIALITY
 "Each party shall maintain the confidentiality of the information received during the mediation and shall not in any arbitral, judicial, or other proceeding rely on or introduce as evidence:
 "(a) Views expressed or suggestions made by another party with respect to a possible settlement of the dispute;
 "(b) Admissions made by another party in the course of the mediation proceedings;
". . . .
 "The court shall neither inquire into, nor receive information about, the positions of the parties taken in mediation proceedings; the facts elicited or presented in mediation proceedings; or the cause or responsibility for termination or failure of the mediation process."
The evidence at issue consists of tables, created by Dr. McCarl, illustrating the location of the coal within LE's mineral estate. The tables reflect the total area, weight, and possible value of the coal within LE's mineral estate. ADOT contends in its brief to this Court that "the sole purpose of these documents was to facilitate a compromise and settlement of this case through mediation." If that were not so, however, LE would have been entitled to elicit the contents of the tables under Rule 705, Ala.R.Evid., "Disclosure of Facts or Data Underlying Expert Opinion":
 "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." *Page 804 
During ADOT's direct examination, Dr. McCarl testified:
 "Q [Counsel for ADOT]: And have you come to an opinion and did you express — let's — have you come to an opinion as to whether or not the coal on the [LE] tract could be economically recoverable?
"A [McCarl]: Yes, sir, that is correct.
". . . .
"Q: All right. And how did you do that?
 "A: We — we looked at the geological information concerning the tract. We did some drawing. And we put down, as well as to verify, the thickness of the coal in the area and also gave a burden. We looked at the — at the high walls on the sides of the — of the tract that have already have been indicated in the testimony so far. We went out there and actually looked at them and — so that we could see what the measurements were in terms of how high the rock was and the walls. And, of course, the drill hole information gave us overburden, how much rock there was over the coal. There's no question that there was coal there. It just was too deeply buried, very high overburden — over 38 to 1, virtually, the entire area with variable rations down at the very extreme southern end of it that were in the 36 to 1 ratio."
During cross-examination of Dr. McCarl, counsel for LE showed him two of the tables and elicited from him, without objection, numerous details concerning the contents of the tables, relating to data relevant to Dr. McCarl's previous opinion testimony. Thereafter, the following ensued during a bench conference:
 "[Counsel for ADOT]: I don't remember that having been prepared for litigation. I will not say with contrary opinion what it was. We did prepare some documents for mediation to show positions. And if that was one of them, then we would certainly object to it appearing in this case.
". . . .
 "[Counsel for LE]: . . . What I told [ADOT counsel] is when we started this case is, thatI — we would be straight up with him. We would give him our coal reserves. I gave him our coal reserves, and then he invoked the right to — the privilege on any state stuff, make anything available. At mediation, I told [ADOT counsel] that I was disappointed that he had taken the position that every single thing that his experts did, he was going to argue confidentiality or privilege on where I had made a good faith proposal to him, trying to get this case settled early, gave him my coal reserves, a very conservative estimate, and he then provided me with that. That is how I recall that I obtained those documents.
"[Counsel for ADOT]: Okay.
". . . .
 "[Counsel for LE]: But the document doesn't reveal anywhere on there about mediation or what was said —
 "[Counsel for ADOT]: But if it was prepared for that and we came to mediation to deal and to accept for mediation a position that was different from our answer and different from today, I don't — I don't think mediation is the place for that. We came — and if that's what took place, I don't think it should be —
". . . .
 "[The Court]: It has on here, see drill logs. There have been some drill logs admitted. I don't know if those are the ones that are referenced here.
 "[Counsel for LE]: They used three drill hole logs that [LE] had done. And they had two drill holes of their own. *Page 805 
 "[The Court]: But have all the drill logs or holes, has all that been admitted into evidence?
"[Counsel for LE]: It has.
 "[The Court]: Okay. So it looks, to me, like [Dr. McCarl] is getting this from the drill log.
". . . .
 "[Counsel for ADOT]: Let me ask something. Did you furnish this to me as part — of your [pretrial] disclosure?
"[Counsel for LE]: Yes, I did."
(Emphasis supplied.)
The next morning counsel discussed the matter further with the court:
 "[Counsel for LE]: Your honor, I think we have one matter to take up beforehand. [The tables] are reports done by Dr. McCarl on April 18, about a week after his deposition. They were produced to me. I had an outstanding request of production for all of his reports regarding valuations. [Counsel for ADOT] gave these to me at the conclusion of the mediation
after I discussed with him that I thought we had a gentlemen's agreement that we would swap valuation reports and try to get this case settled early. He never, at any time, said this is the subject of mediation or this is only — he gave me his expert's reports and some kind of compromised format. I assumed he was making good on his earlier promise and his — and my outstanding discovery request. . . .
". . . .
 "[The Court]: Okay. Go ahead. What is your objection going to be?
 "[Counsel for ADOT]: My objection was that they were furnished in an attempt to come to a compromise at mediation and not that they would be any different in any numbers, but, they were done with respect to compromise an attempt at it. And if he wants to — you said yesterday that the documents wouldn't be admitted, but you could ask — he could ask the questions. I would like that.
". . . .
 "[Counsel for LE]: . . . I've gone back — we didn't mediate this case until June 15. You know, these are the expert reports I had been waiting on from my outstanding discovery request. There was never any — these are just solely for med —
 "[The Court]: My main concern is when [Dr. McCarl] said that, I did not want any — him to testify as to any mediation proceedings. I mean, you know —
"[Counsel for LE]: And we won't ask him about that.
 "[The Court]: And I'm going to caution you [apparently addressing Dr. McCarl] with any — don't refer to mediation when you're — if it — in any of your answers."
(Emphasis supplied.) Earlier Dr. McCarl had begun to state in the presence of the jury that he had prepared one of the tables for mediation, but counsel for ADOT cut him off with an objection before he could answer. When Dr. McCarl later attempted to broach the subject again, the trial judge cut him off, advising, "Your attorney, he's spoken."
Under this state of the record (given the exclusion of Dr. McCarl's attempts to speak to the issue), it is not clear that the tables were prepared solely for the mediation. Counsel for LE understood that the tables were provided by ADOT's counsel "at the conclusion of the mediation," in response to LE's preexisting discovery requests. Thus, it has not been shown that the trial court exceeded its discretion in allowing the tables prepared by Dr. McCarl into evidence.
ADOT argues that LE's injection into the proceedings of the issue of ADOT's *Page 806 
failure to notify it of the condemnation action caused ADOT to be unfairly prejudiced. It concedes that the references to that fact would constitute only harmless error, but for "the context" of the jury instruction, relating to "improper," as opposed to "unlawful," prevention of access. Our disposition of the "improper" versus "unlawful" issue renders this dependent issue moot.
ADOT's final argument is that the trial court erred by allowing LE to present evidence of certain methods for valuing mineral estates. ADOT's position is that if a taking of LE's mineral estate did occur, it was only a partial taking because no minerals other than coal were taken. The record contains no suggestion, however, that any other minerals of value exist beneath the surface. Based upon its premise that if taking occurred it was only a "partial taking," however, ADOT cites Ala. Code 1975, § 18-1A-170(b), as the appropriate basis for the measure of compensation. That Code section expressly deals only with property acquired by eminent domain, and deals only with "a partial taking." The valuation rule in § 18-1A-170(b) for such a taking is "the difference between the fair market value of the entire property before the taking and the fair market value of the remainder after the taking." ADOT argues that Dr. McCarl's testimony showed that the coal was economically unrecoverable before the Corridor X project. ADOT ignores testimony of other witnesses, quoted earlier, to the effect that the coal could have been economically recovered.
ADOT argues that allowing LE to present evidence of estimated coal reserves and the royalty rate per coal ton was in error. ADOT cites as its sole support for this argument Mills v. UnitedStates, 363 F.2d 78 (8th Cir. 1966). In that conventual-condemnation case, the owners of the surface rights of the condemned property were also the owners of the mineral rights. The owners' valuation evidence was "presented primarily through witness B.E. Cobb," who was not an owner and whose qualifications are not mentioned. "Cobb's valuation was simply the product of his estimate of reserves [of coal] and 25 cents per ton, that is, tons in place times a suggested royalty."363 F.2d at 80. The government offered opposing evidence of before and after values of the surface, with the coal (which, at depths of 130 to 230 feet on one tract and 80 feet on another, could be reached only by underground mining) being evaluated as having "little or no value." Id. The landowners were awarded damages for the value of the coal, but only $7,400. Their sole contention on appeal was that Cobb's testimony was the only competent evidence of value and thus had to be accepted. The United States Court of Appeals for the Eighth Circuit rejected that contention, noting many assumptions made by Cobb of demand and willing buyers, supported only by his "own comment that he `would be interested in buying tracts of land such as' those of the owners. . . ." 363 F.2d at 81. In the present case the various witnesses called by LE to offer value estimates supported their assumptions of demand and willing buyers with explanations. Thus, we cannot say that Mills, the sole case cited by ADOT on this point, requires reversal of the judgment entered on the jury award.
ADOT also argues that § 18-1A-197(3) of the Eminent Domain Code prohibits "as a basis for an opinion as to value of property . . . [t]he price at which property was optioned, offered, mortgaged or listed for purchase, sale or lease." That Code section relates only to condemnation actions. ADOT asserts, with respect to it, that the "only evidence" LE presented of value of the property was the royalty rate *Page 807 
at which LE had unsuccessfully offered to lease its coal. The testimony of Eads, however, was to the effect that LE had successfully leased the coal rights to Lost Creek Coal Company, at a royalty of $2.40 per ton and an additional $50,000 per year, and that only the timing of subsequent events interfered with the lease.
Finally, with respect to its claim that the valuation evidence was improper, ADOT argues that if it had been allowed to show the recording tax LE had paid on the deed for the approximately 7,000 to 7,200 acres in Marion County, the jury could have worked backward somehow to calculate a per acre value specifically for the 120-acre tract. Suffice it to say that LE presented sufficient reasons when that issue came up to demonstrate the unreliability of trying to determine the value of individual acres from mineral documentary taxes and deed taxes paid on over 7,000 acres as to which LE had both surface and mineral rights.
ADOT does not otherwise argue that there was insufficient evidence of value before the jury and it does not otherwise argue that the jury's determination of value was itself excessive.
Under the instructions to the jury concerning the calculation of damages, the points ADOT argues concerning valuation evidence do not discredit the result reached by the jury.
 IV. Conclusion
Having carefully considered each argument of error asserted by ADOT and having found none of them to represent reversible error, we affirm the trial court's judgment.
AFFIRMED.
SEE, BROWN, WOODALL, and STUART, JJ., concur.
[1] The parties alternated at trial between referring to the defendant as ADOT and "the State of Alabama" or "the State," and likewise do so in their briefs to this Court. We will use "ADOT" exclusively as a convenient, but clear, shorthand reference. At no time did ADOT assert State immunity as a defense at the trial court level. In its principal brief to this Court it states: "Though the Director of ADOT is the proper party, this brief maintains the convention used in the pleadings of naming the agency as the party defendant."
[2] The effect of § 18-1A-32(a), set out earlier in this opinion, is that ADOT, as the condemnor, should not intentionally fail to condemn and require a landowner to file an inverse-condemnation action.
[3] Penn Central commented that "[i]t is, of course, implicit in Goldblatt that a use restriction on real property may constitute a `taking' . . . perhaps if it has an unduly harsh impact upon the owner's use of the property." 438 U.S. at 127,98 S.Ct. 2646.
[4] We recognize that in some cases the figures relating to acreage and tonnage of coal presented by this testimony differ slightly from the figures used elsewhere in this opinion.
[5] "The owner of personal or real property generally may testify to the value of such property without other qualifications." Charles W. Gamble, McElroy's Alabama Evidence
§ 128.11, p. 625 (5th ed. 1996). Section 18-1A-192(a)(3), Ala. Code 1975, a part of Article 11 of the Eminent Domain Code, provides that a "shareholder, officer, or regular employee designated to testify on behalf of an owner of the property" may testify as to the value of property, "if the owner is not a natural person." Although ADOT sometimes contends in its briefs that the provisions of the Eminent Domain Code are irrelevant to this inverse-condemnation action, it cites as relevant §18-1A-196 and § 18-1A-197(3), parts of the same Article that includes § 18-1A-192. "When § 18-1A-192 was enacted, the law of Alabama was that . . . `[A]n owner of real property may testify to the value of such real property without other qualifications.'" E-Z Serve Convenience Store, Inc. v. State,686 So.2d 351, 353 (Ala.Civ.App. 1996) (quoting Gregath v.Bates, 359 So.2d 404, 407 (Ala.Civ.App. 1978)).
[6] Rule 11, Ala.Civ.Ct.Med.R., was amended effective June 26, 2002, to help clarify the rule and to provide certain exceptions.