STUART, Justice.
 

 Tammy Roebuck sued CNH America, LLC (“CNH”), in the Marshall Circuit Court seeking damages for the wrongful death of her husband, Chris Roebuck, who was killed in an accident involving a backhoe manufactured by CNH. At the conclusion of a jury trial, the jury returned a verdict in favor of CNH; however, on Roebuck’s motion, the trial court subsequently ordered a new trial on the ground of juror misconduct. CNH appeals, arguing that the trial court exceeded its discretion in ordering a new trial or, in the alternative, that the trial court erred by denying its motion for a judgment as a matter of law. Because we conclude that the trial court erred in denying CNH’s motion for a judgment as a matter of law, we reverse and remand.
 

 I.
 

 On April 9, 2005, Chris Roebuck and his brother, Shane Roebuck, were helping their father, Carl Roebuck, use a 580SK loader backhoe manufactured by Case Corporation, a predecessor to CNH, to move a large feed bin on Carl’s farm in Marshall County.
 
 [1]
 
 Because they were having difficulty attaching the feed bin to the bucket of the backhoe, Chris left to procure a larger chain to use in the effort. While he was gone, however, Carl and Shane used a different chain to drag the
 
 *43
 
 feed bin to the desired location. They then returned with the backhoe to the original work site.
 

 When Chris returned with the larger chain, Carl was sitting in the operator’s seat of the idling 580SK facing the front loader end. Chris approached the 580SK from the backhoe end and proceeded to toss an approximately 12-pound chain into the operator’s cab. When the chain landed in the cab, it landed on top of one of the foot-swing pedals for the backhoe, causing the boom on the backhoe to swing to the side, pinning Chris between the boom and a stabilizer post on the side of the 580SK. Shane quickly climbed aboard the 580SK and pressed the other foot-swing pedal to free Chris; however, Chris had already suffered severe internal injuries, and he died several hours later at the University of Alabama Hospital in Birmingham, where he had been transported via air ambulance after initially being treated at Marshall Medical Center in Boaz.
 

 On December 20, 2005, Tammy Roebuck sued CNH in the Marshall Circuit Court, asserting claims of breach of warranty, defective design under the Alabama Extended Manufacturer’s Liability Doctrine (“AEMLD”), and general negligence, including failure to warn and post-sale negligence for failing to warn, recall, or retrofit the 580SK in question. The case proceeded to trial on June 9, 2008. CNH moved for a judgment as a matter of law after Roebuck had submitted her evidence and again at the close of all the evidence, arguing, among other things, that Roebuck’s breach-of-warranty claim was barred by the applicable statute of limitations and that her various tort claims failed because, CNH argued, Roebuck had failed to establish that the 580SK Carl owned was in substantially the same condition when Chris was killed as it was when it was manufactured. In fact, CNH argued, the evidence established that the 580SK
 
 had
 
 been substantially modified after leaving CNH’s control — the hand controls on the backhoe had been changed to foot controls, and, CNH argued, that modification was the proximate cause of Chris’s injuries and death, not any negligence or errors that might be attributable to CNH. The trial court denied both of CNH’s motions requesting a judgment as a matter of law.
 

 On June 20, 2008, the jury returned a verdict in favor of CNH. On July 21, 2008, Roebuck moved for a new trial, arguing that two jurors had failed to disclose on their jury questionnaires that they had previously been defendants in lawsuits seeking money damages and that, had those jurors answered the questionnaire truthfully, she would have struck them from the jury panel. Roebuck subsequently amended her motion to allege that, during jury deliberations, a third juror had received a telephone call from an unknown party conveying information about the case that had not been introduced during the trial. On October 15, 2008, the trial court granted Roebuck’s motion and ordered a new trial based on the evidence of juror misconduct. CNH then renewed its motion for a judgment as a matter of law; however, the trial court denied that motion on November 20, 2008. CNH appealed.
 

 II.
 

 On appeal, CNH argues that the trial court exceeded its discretion in ordering a new trial or, in the alternative, that the trial court erred by denying its motion for a judgment as a matter of law. This Court outlined the standard of review applicable as to each of these arguments in
 
 Alabama Department of Transportation v. Land Energy, Ltd.,
 
 886 So.2d 787, 791-92 (Ala.2004):
 

 “ ‘When reviewing a ruling on a motion for a [judgment as a matter of
 
 *44
 
 law], this Court uses the same standard the trial court used initially in granting or denying the motion.
 
 Palm Harbor Homes, Inc. v. Crawford,
 
 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution.
 
 Carter v. Henderson,
 
 598 So.2d 1350 (Ala. 1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a [judgment as a matter of law]. See § 12-21-12, Ala.Code 1975;
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury.
 
 Carter,
 
 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.
 
 Id.
 
 If the question is one of law, this Court indulges no presumption of correctness as to the trial court’s ruling.
 
 Ricwil, Inc. v. S.L. Pappas & Go.,
 
 599 So.2d 1126 (Ala.1992).’
 

 “Ex parte Alfa Mut. Fire Ins. Co.,
 
 742 So.2d 1237, 1240 (Ala.1999).
 

 “ ‘[T]he ruling on a motion for new trial is within the discretion of the trial court[,] and ... the trial court’s decision carries a strong presumption of correctness.
 
 Gold Kist, Inc. v. Tedder,
 
 580 So.2d 1321, 1322 (Ala. 1991). The decision of the trial court should not be disturbed on appeal unless the record plainly and palpably shows that the trial court erred and that some legal right has been abused.’
 

 “McBride v. Sheppard,
 
 624 So.2d 1069, 1070-71 (Ala.1993).”
 

 III.
 

 We first consider CNH’s argument that it was entitled to a judgment as a matter of law on all the claims asserted by Roebuck. With regard to Roebuck’s breach-of-warranty claim, CNH argues that that claim is barred by § 7-2-725(1), Ala.Code 1975, which provides that “[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.” Section 7-2-725(2) further provides that “[a] cause of action accrues when the breach occurs” and “[a] breach of warranty occurs when tender of delivery is made....” Because Carl took delivery of his 580SK on July 26, 1993, CNH argues that any breach of warranty that occurred would have occurred on that date, and any claim based upon that breach should have been brought within the next four years, or by July 26, 1997. Roebuck’s claim is clearly outside that period; therefore, CNH argues, it is time-barred.
 

 However, Roebuck argues that her action falls within an exception in § 7-2-725(2) for consumer goods. That exception provides that “a cause of action for damages for injury to the person in the case of consumer goods shall accrue when the injury occurs,” and, Roebuck argues, because Chris was injured on April 9, 2005, and because she filed her claim less than nine months later on December 20, 2005, her claim was filed within the four-year period allowed by law. The timeliness of Roebuck’s claim therefore hinges on whether the 580SK by which Chris was injured was a “consumer good.”
 

 
 *45
 
 “Consumer goods” are defined in § 7-9A-102(a)(23), Ala.Code 1975, of Alabama’s Uniform Commercial Code as “goods that are used or bought for use primarily for personal, family, or household purposes,” so we must accordingly determine whether the 580SK Carl purchased was “used or bought for use primarily for personal, family, or household purposes.” At trial, the undisputed evidence indicated that Carl originally purchased the 580SK to use in his construction business. It was also established that Carl left the construction business in approximately 2004 and that after that time he used the 580SK primarily around his approximately 70-acre farm in Marshall County. Roebuck therefore argues that even though the 580SK might have once been considered business equipment, it became a consumer good when Carl found a personal use for it outside the construction business. In support of her argument that the legal classification of a good can change when that good is put to a different use, Roebuck cites
 
 Ex parte General Motors Acceptance Carp.,
 
 425 So.2d 464 (Ala.1983), in which this Court concluded that an automobile was a consumer good at the time it was purchased by the owner of a used-car dealership for his personal use but that the automobile was converted to business inventory when the owner subsequently placed it for sale at his dealership. In rejecting the argument that a car that was once a consumer good must thereafter remain a consumer good, this Court stated:
 

 “[The petitioner] argues that the car was a consumer good when it was sold to [the respondent] and that it remained a consumer good regardless of the actions taken by [the respondent]. This is not the case. White and Summers deal directly with this kind of situation:
 

 “‘Note well that [§ ]9-109 [of the Uniform Commercial Code] does not classify goods according to design or intrinsic nature but according to the use to which their owner puts them. It follows that as use changes,
 
 either because the owner finds some new task for the goods
 
 or because an owner sells the goods to another who uses it for another purpose, the classification of the goods will also change.’
 

 “J. White
 
 &
 
 R. Summers,
 
 Uniform Commercial Code
 
 § 23-7 (2d ed.1980). (Emphasis added.)”
 

 Ex parte General Motors Acceptance Corp.,
 
 425 So.2d at 466.
 

 However, although we agree that the classification of a particular good may change with the use of the good, and that Carl’s use of his 580SK may have changed over time, the evidence in the record nevertheless indicates that Carl’s use of this 580SK never changed in a manner that would convert it from business equipment to a consumer good. In other words, there is no substantial evidence indicating that the 580SK was ever used as a consumer good, that is, “primarily for personal, family, or household purposes.” § 7-9A-102(a)(23). When Roebuck’s attorney questioned Carl at trial about his use of the 580SK, Carl testified as follows:
 

 “Q: The first several years, or when you got the baekhoe, Mr. Roebuck, were you still in the construction business?
 

 “A: Yes.
 

 “Q: Did you have a farm, also?
 

 “A: Uh-huh.
 

 “Q: What kind of work in the construction business did you do?
 

 “A: Well, we put in septic tans and general construction work, dig footings, that type of thing.
 

 “Q: And you used that — the [580SK] baekhoe in this case for that purpose?
 

 “A: That’s correct.
 

 
 *46
 
 “Q: After several years passed and in the few years leading before Chris’s death, had you gotten out of doing work for the public?
 

 “A: Yes.
 

 “Q: What did you use the backhoe for mostly during those—
 

 “A: We worked on the farm with it most of the time, burying cows and whatever.”
 

 On cross-examination, Carl was again asked about this subject and gave the following testimony:
 

 “Q: Now, let’s get back to your business for a second. Shane testified the other day, and I think you’ve testified here today, that you obviously bought this backhoe we’re here about for your business, right?
 

 “A: Yes.
 

 “Q: From 1993 until sometime in the early 2000s — 2003, 2004 — that’s what you used your backhoe for?
 

 “A: That’s correct.
 

 “Q: Your construction and excavation business?
 

 “A: Yes.
 

 “Q: And then I guess around that time when you stopped doing that work, you took it out to your farm?
 

 “A: Well, the farm’s connected to the business.
 

 “Q: I’ve got you. Okay.
 

 “A: Yeah.
 

 “Q: And I think you told us in your deposition that you were trying to raise — get up your herd of cattle on the farm, right, about that time?
 

 “A: Yes.
 

 “Q: And try to turn it into a small little moneymaker for you?
 

 “A: If possible.
 

 “Q: But you were trying, right?
 

 “A: Yes.”
 

 Even when we view this testimony in the light most favorable to Roebuck, as we must,
 
 see Land Energy, Ltd.,
 
 886 So.2d at 791-92, it does not indicate that Carl’s use of the 580SK ever shifted to a primarily personal, family, or household purpose; rather, it indicates only that it shifted from one business use — construction and excavating — to another business use — farming and ranching. Although his residence was located on the farm property, Carl acknowledged that he was trying to operate the farm for a profit and that the 580SK was used primarily for farm work. When asked directly how he used the 580SK, Carl replied, “working] on the farm ... burying cows and whatever,” a use clearly connected to his effort to raise cattle for profit. Although the 580SK might have been used occasionally, and even on the occasion of the accident, by Carl and other family members for purposes not directly related to the business of the farm, whether the 580SK was a consumer good under § 7-9A-102(a)(23) depends on its
 
 primary
 
 use. The evidence does not support Roebuck’s assertion that the 580SK was used
 
 primarily
 
 for personal, family, or household purposes; therefore, we must conclude that it was not a consumer good. A breach-of-warranty claim against CNH is therefore not subject to the consumer-goods exception to the statute of limitations in § 7-2-725. Roebuck’s breach-of-warranty claim is accordingly time-barred because it was brought more than four years after the date the claim accrued in July 1993.
 

 IV.
 

 CNH next argues that it is entitled to a judgment as a matter of law on Roebuck’s various other claims, which are all tort-based, because, it says, Roebuck failed
 
 *47
 
 to establish that Chris’s injuries and death were proximately caused by any misconduct or negligence attributable to CNH. Rather, CNH argues, the evidence established that the 580SK had been substantially modified after leaving CNH’s control and that that modification was the proximate cause of Chris’s injuries and death, not any negligence or errors that might be attributable to CNH. Specifically, CNH argues that when the 580SK left its factory, it was equipped with dual-lever hand controls that operated the backhoe, not foot-swing pedals. CNH further argues that a review of the 580SK after the accident revealed that whoever had converted it from hand controls to foot pedals failed to change the centering spring from the purple spring used with hand controls to the more rigid black spring used with foot pedals
 
 [2]
 
 and that, had the centering spring been switched, the accident would not have occurred because, CNH says, the 12-pound chain thrown into the operator’s cab by Chris would not have applied sufficient force to the foot-swing pedal to compress the more rigid black centering spring and activate the backhoe.
 

 In support of its argument that the 580SK was substantially modified after leaving the factory, CNH submitted factory records indicating that the 580SK purchased by Carl was built with dual-lever hand controls, and not foot-swing pedals. Those factory records also indicated that, after its manufacture was complete, the 580SK was sent to an independent dealer in Jackson, Mississippi — Tubb Equipment and Rental Company- — for sale to the public, and the records of Tubb Equipment and Rental likewise indicate that the 580SK was equipped with dual-lever hand controls.
 

 Importantly, Roebuck does not dispute that the accident that killed Chris would not have occurred if the correct centering spring had been in place. However, Roebuck argues that CNH is still not entitled to a judgment as a matter of law because, she says: (1) a question of fact exists as to whether the 580SK Carl purchased was manufactured with hand controls or foot controls, and (2) CNH should have foreseen that the purple centering spring might be used in a 580SK even after it was converted to foot controls. In support of her first argument, Roebuck highlights evidence indicating that approximately 75% of the 580SKs CNH built had foot-swing pedals as opposed to hand controls; that the records of Tubb Equipment and Rental indicate that it did not convert the backhoe controls on the 580SK before transferring it to the dealer that ultimately sold it to Carl, Mid-Southern Equipment in Huntsville; that there is no evidence indicating that Mid-Southern Equipment converted the backhoe controls from hand to foot operation; and that when Carl received the 580SK from Mid-Southern Equipment on July 26, 1993, it had foot controls. Thus, Roebuck argues, the evidence supports two contrary inferences, either of which a jury could reasonably believe — that the 580SK was converted to foot controls after it left the CNH factory or that the 580SK had foot controls when it left the factory. Accordingly, she argues, a judgment as a matter of law is inappropriate.
 

 However, we disagree that Roebuck submitted sufficient evidence to create a question of fact on this point. As the claimant, Roebuck bore the burden of establishing that Carl’s 580SK had not been substantially modified at the time of
 
 *48
 
 the accident from the condition in which it left the factory.
 
 Sears, Roebuck & Co. v. Harris,
 
 680 So.2d 1018, 1026-27 (Ala. 1993). At trial, business records from both CNH and Tubb Equipment and Rental were submitted that indicated that the 580SK Carl purchased had hand controls when it was manufactured and delivered to Tubb Equipment and Rental. Roebuck has submitted nothing that would rebut that evidence; instead, she speculates that, because 75% of the 580SKs CNH manufactured had foot controls, perhaps those records are in error and the 580SK Carl purchased was also built with foot controls. However, “evidence which affords nothing more than mere speculation, conjecture, or guess is wholly insufficient to warrant submission of the case to the jury.”
 
 Roberts v. Carroll,
 
 377 So.2d 944, 946 (Ala.1979) (citing
 
 Headrick v. United Ins. Co. of America,
 
 279 Ala. 82, 181 So.2d 896 (1966)).
 

 Moreover, although Roebuck also emphasizes that there is no evidence indicating that Mid-Southern Equipment converted the 580SK to foot controls, that fact is misleading because Mid-Southern Equipment is no longer in business and there is no evidence whatsoever regarding its handling and maintenance of the 580SK Carl purchased. What undisputed evidence is in the record, however, indicates, in chronological order: 1) that the 580SK Carl purchased was manufactured with backhoe hand controls; 2) that the 580SK Carl purchased had backhoe hand controls at all times while in the possession of Tubb Equipment and Rental; 3) that Carl ordered a 580SK with foot-swing pedals from Mid-Southern Equipment; 4) that Tubb Equipment and Rental transferred the 580SK that was ultimately sold to Carl to Mid-Southern Equipment on July 23, 1993; and 5) that when Mid-Southern Equipment delivered that 580SK to Carl three days later, on July 26, 1993, it had foot-swing pedals, not hand controls. When considering this evidence, we cannot agree with Roebuck that “fair-minded persons in the exercise of impartial judgment” could reasonably infer, contrary to all the records that have been produced, that CNH manufactured the 580SK purchased by Carl with foot-swing pedals.
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989). If anything, the reasonable inference to be made is that the 580SK Carl purchased was modified by Mid-Southern Equipment to meet the request of the customer who ordered it. It is unfortunate that the records from Mid-Southern Equipment are unavailable; however, to conclude that there is a question of fact regarding the backhoe controls of the 580SK Carl purchased based upon that unavailability would essentially shift the burden of proof from Roebuck to CNH. Such a burden shifting is impermissible under our law.
 

 Roebuck also argues that CNH is not entitled to a judgment as a matter of law because, she says, even if the 580SK had been substantially modified before the accident, CNH should have reasonably foreseen that modification.
 
 See Hams,
 
 630 So.2d at 1027 (“A manufacturer or seller remains liable ... if the alteration or modification was reasonably foreseeable to the manufacturer or seller”). Roebuck argues that CNH should have foreseen that the wrong centering spring could be left in a 580SK when the backhoe was converted from hand controls to foot controls because, first, CNH knew such conversions occurred and, in fact, produced and sold a kit to accomplish those conversions, and, second, CNH had learned, in 1998 or 1999, of an accident that occurred in Alaska involving a foot-operated 580SK backhoe in which the correct centering spring had not been installed.
 

 
 *49
 
 CNH argues, however, that the Alaska accident it learned of in 1998 or 1999 has no bearing on whether it could have foreseen, at the time the 580SK here was manufactured and delivered to Carl, that the wrong centering spring might be used in a hand-control-to-foot-control conversion because the knowledge of the Alaska accident was not acquired until approximately five years
 
 after
 
 Carl purchased his 580SK.
 
 [3]
 
 Moreover, although CNH acknowledges that it was foreseeable that hand controls on a 580SK would sometimes be converted to foot controls and that it produced a kit so that such a conversion could be performed, it argues that it was not foreseeable that the conversion would be performed incorrectly and that the wrong centering spring would be left in the backhoe in light of the fact that the conversion kit included the correct centering spring and the included instructions specifically instructed the person performing the conversion as to how to switch the springs. We agree.
 

 It is instructive to compare the facts of the present case with the facts in
 
 Harris,
 
 in which this Court concluded that a modification to a product that subsequently caused an injury
 
 was
 
 foreseeable and that the manufacturer was therefore subject to liability notwithstanding the modification to the product. 630 So.2d at 1027. We summarized
 
 Harris
 
 as follows in
 
 Horn v. Fadal Machining Centers, LLC,
 
 972 So.2d 63, 72-73 (Ala.2007):
 

 “Harris
 
 involved, among other things, an AEMLD action against a manufacturer and a retailer arising out of the improper installation of a water heater, resulting in the severe carbon-monoxide poisoning of the occupants of a mobile home. The heater was improperly installed ‘without a pipe to vent carbon monoxide and other exhaust gases outside the mobile home.’ 630 So.2d at 1023. The heater was previously owned, and no ‘draft hood’ accompanied the heater when it left the original purchaser’s possession.
 

 “ ‘At trial, [the installer for the occupants] testified that when he installed the water heater he did not know that gas water heaters required venting.’ 630 So.2d at 1023. After a jury returned a verdict against the manufacturer and seller, the manufacturer and seller moved for a judgment notwithstanding the verdict [now called a judgment as a matter of law], arguing, among other things, that the plaintiffs had failed to ‘carry their burden of establishing that the water heater had not been substantially altered between its [sale] and the time of the accident.’ 630 So.2d at 1027. Indeed, the ‘undisputed evidence was that when the water heater was installed in the mobile home its draft hood and vent pipe and the plastic pouch containing the instruction manual were missing.’ 630 So.2d at 1023. However, the trial court denied their motion, and they raised that issue on appeal. The plaintiffs argued that ‘[i]t was foreseeable ... that the pouch containing the instruction manual, as well as the draft hood and vent pipe, would be removed from the water heater.’ 630 So.2d at 1027.
 

 “This Court agreed with the plaintiffs and held that ‘the trial court did not err in denying the motions for a [judgment notwithstanding the verdict] on the basis of a substantial alteration of the product.’ 630 So.2d at 1028. The Court stated:
 

 
 *50
 
 “ ‘[W]e hold that the changes in the water heater either were not substantial alterations or, if they were substantial alterations, were foreseeable. First, the evidence shows that the vent pipe was not sold with the water heater. The instruction manual states that the customer must provide his own vent pipe. Therefore, the absence of a vent pipe cannot be a substantial alteration of the product. Second, substantial evidence shows that the instruction manual [and] the draft hood ... were detachable and easily removed. When the water heater was originally sold, the instruction manual was contained in a plastic pouch affixed to the water heater by adhesive tape. The draft hood was attached by slipping tabs located on the legs of the draft hood into holes placed in the jacket top covering the top of the water heater....
 
 Thus, the removal of the manual [and] the draft hood ... was a foreseeable alteration of the water heater.’
 

 “630 So.2d at 1028 (emphasis added).”
 

 (Footnote omitted.) Thus, in
 
 Harris,
 
 the occupants of a mobile home were injured when a water heater was improperly installed without a draft hood or vent piping, causing carbon monoxide to build up inside the home. We concluded that the manufacturer and/or retailer should have foreseen that possibility because vent piping was not included with the water heater and the instruction manual and draft hood were easily separable from the water heater.
 

 In this case, however, although the circumstances of the conversion of Carl’s 580SK are not known, there is evidence indicating that the conversion kit distributed by CNH included the correct centering spring that should be installed during the conversion from hand controls to foot controls — unlike the water heater in
 
 Harñs,
 
 which did not include the necessary vent piping — and that the instruction manual included in the kit detailed the process necessary to switch out the centering springs. CNH could not have reasonably foreseen that the person converting the 580SK to foot controls would have both: (1) failed to follow the instructions included in the kit for accomplishing that conversion and (2) failed to install a necessary part that was included in the conversion kit.
 
 See Morguson v. 3M Co.,
 
 857 So.2d 796, 801 (Ala.2003) (holding that the substantial modification of medical equipment was not foreseeable to the manufacturer where, among other things, the equipment had been incorrectly assembled and the assembler failed to follow hospital instructions for verifying equipment was correctly assembled).
 
 See also Mendez v. Honda Motor Co.,
 
 738 F.Supp. 481, 484 (S.D.Fla. 1990) (holding that there was no design defect where “[p]laintiff clearly misused the motorcycle by installing the shock absorbers, without referring to the owner’s manual or any other source of information, upside down”).
 

 To succeed on any of her tort-based claims, Roebuck was required to establish that Chris’s death was proximately caused by some act of CNH’s. However, even if she was able to establish that CNH was guilty of some negligence or wantonness related to Carl’s 580SK, the undisputed evidence nevertheless indicates that the proximate cause of the accident that led to Chris’s death was not that negligence or wantonness, but the improper modification of the 580SK when it was converted from hand controls to foot controls. Because Roebuck failed to introduce substantial evidence indicating that CNH proximately caused the accident leading to Chris’s death, CNH is entitled to a judgment as a matter of law on
 
 all
 
 the tort claims asserted by Roebuck.
 
 See King v. National Spa
 
 
 *51
 

 & Pool Inst., Inc.,
 
 607 So.2d 1241, 1247 (Ala.1992) (“[W]e note that the settled policy of our system of tort law is to place the responsibility for compensation for an injury on the party that proximately causes the injury.”).
 

 V.
 

 Roebuck sued CNH after her husband was killed in an accident involving a backhoe manufactured by CNH. A jury returned a verdict in favor of CNH, but the trial court subsequently ordered a new trial as a result of juror misconduct. On appeal, CNH argues that the trial court exceeded its discretion in ordering a new trial or, in the alternative, that CNH was entitled to a judgment as a matter of law. We agree that the trial court erred in failing to enter a judgment as a matter of law in favor of CNH because Roebuck’s breach-of-warranty claim was barred by the applicable statute of limitations, and, in regard to her tort claims, she failed to present substantial evidence of proximate causation. Our resolution of this issue makes it unnecessary for us to consider whether the trial court also exceeded its discretion in granting Roebuck’s motion for a new trial. The judgment of the trial court is accordingly reversed and the cause remanded for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and LYONS, WOODALL, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
 

 [1]
 

 . The 580SK is a multi-use piece of construction equipment with a loader on the front end and a backhoe on the rear end. The operator's seat swivels 180 degrees so that the operator can face either the loader or the backhoe, depending on which is being used.
 

 [2]
 

 . CNH sold a kit that could be used to convert a 580SK backhoe from hand controls to foot-pedal controls. That kit included a black centering spring, and the user was instructed to replace the existing purple centering spring with that new black spring.
 

 [3]
 

 . At trial, a CNH representative also testified that, even though the 580SK involved in the Alaska accident had the wrong centering spring in the control mechanism of the backhoe, the centering spring was not the cause of the accident.