## ALDRIDGE *vs.* THE TUSCUMBIA, COURTLAND, AND DECATUR RAIL ROAD COMPANY.

1. The constitution of this state does not prohibit the condemnation of private property, by the government, for the *public benefit*, if compensation be made to the owner thereof.
2. It is not essential to the exercise of this power, that the property so condemned should be in the continued occupation of the government, or its ageut.
3. The sovereign power which possesses this right of condemning private property, is the same as the law making power. With us it resides in the people, who have transferred its exercise to their representatives, under such restrictious as are imposed by the constitution.
4. A retrospective act of the legislature, which wouid take away a right of property, or dissolve the obligation of a contract, would be unconstitutional and void.
5. But the legislature may pass an act that in many respects would be retrospective, yet valid—such as an act changing a remedy, after a cause of action has accrued—changing the jurisdiction of a court, or a mode of securing testimony, &c.
6. *Semble*—the prohibition against the passage of *ex post facto* laws in the constitution of the United States, applies to criminal, not civil cases.
7. The condemnation of private property, to the uses and purposes of a rail road company under a charter granted by the legislature, which allows to the party whose property is condemed, a just compensation to be ascertained by a jury ; is clearly within the power of the legislature.

This case came before the Supreme Court, as on a case agreed ; and was designed to test the validity of the 5th section of an act, passed by the legislature of Alabama, incorporating the Tuscumbia, Courtland and Decatur Rail Road Company.

The President and Directors of the Company proceeded, under the authority of the charter, to condemn a portian of the land of the plaintiff in error, under the provisions of the section alluded to, which is as follows:

Sec. 5. *And be it further enacted*, That the said president and directors shall commence said road at the east end of the Tuscumbia rail road, and extend the

same by the way of Courtland and to Decatur, in the county of Morgan. They shall be authorised to contract with, and receive conveyances of any land, stone, or gravel, &c. which may be required in the construction of said road; and when the owner and the company can not agree as to price, or when the owner is an infant, non-resident or *non compos mentis*, then it shall be lawful for the president and directors of said company, to apply to any justice of the peace for a warrant, directed to the sheriff of the county, commanding him to summon a jury of seven disinterested freeholders, a majority of whom shall be authorised to assess the damages, under the same rules and regulations now established by law in cases to other roads, and said jury shall forthwith assess the value of said land, stone, gravel, timber, &c. subject to the right of an appeal to the circuit court by either party, who shall think themselves aggrieved, when the trial shall be *de novo*, by a jury, as in other cases; and the sheriff shall return the same to the office of the clerk of the county court of the proper county, and at the next term of the commissioners' court, the same shall be affirmed, if no objection; and if the court shall set the same aside, the said court shall order a new writ, and the assessment made in pursuance thereof shall be final, and the land, stone, gravel, timber, &c. so contracted for or condemned, shall enure to the said company for fifty years, upon the payment of said money to the person contracted with, or into court, as the case may be; and the whole proceedings shall be entered of record in said court, at the expense of said company : *Provided however*, the said work shall in no wise be delayed on account of the proceedings had as aforesaid; but the said company, on tendering the

ALDRIDGE *vs.* TUSCUMBIA RAIL ROAD COMPANY.

sum to which the land, stone, gravel, or timber, shall have been valued, to the owner, or depositing the same in the office of the clerk of said court, may proceed with said work, if there shall be no appeal : *And provided further*, that no right shall exist in said company, to pull down, or remove any dwelling-house without the consent of the owner thereof.

LIPSCOMB, C. J.—This action was brought before a justice of the peace, under the charter, for the purpose of condemning to the use of the corporation, a portion of a lot of ground, belonging to the plaintiff in error. The justice of the peace proceeded, according to the directions of the charter of incorption, to have a jury empanneled, to consider the advantages and disadvantages that would result to the owner of the land, by the road running on it, and to assess to him such damages as he might sustain from it.

The plaintiff in error was not satisfied with the amount of damages assessed to him, and claimed an appeal to the Circuit court. After the appeal had been taken, the parties consented to bring the cause before this court, by a writ of error, as from an affirmance of the judgment rendered by the justice of the peace. To this course of proceeding, for the purpose of having the case speedily decided, as delay might be extremely injurious, we can perceive no reasonable objection. We are bound to believe that it is not a fictitious case, but that it was brought, and defended, in the court below, in sincerity and truth.

The case was not argued at the bar, but a written argument has been submitted, in behalf of the plaintiff in error, and one for the corporation.

We will proceed to examine the objections, taken in the argument, to the judgment of the justice of the peace.

The position first assumed, is, that the fifth section of the charter is unconstitutional and void, because the road is a work for private, and not for public use.

In support of this position, it is said, that the tenth section of the charter vests the road and the machinery in the company; that no persons, therefore, but those of the company, can run cars on it, without permission—and, that, however great a public benefit it may be, it cannot be for public use.—That the right of public use is the only ground of power, in the legislature, to condemn private property.—That if public benefit and public convenience, gave the right to the legislature, and they were to judge of the expediency of exercising it, there would be no limitation on their acts, and nothing to prevent their passing retrospective laws.—That the condemning private property to public use, is, in no case, the exercise of a law-making power, but is an act of sovereign power, justified only by necessity.—That, in cases of mere benefit and convenience, the legislature has no authority to pass on the existence of the necessity.— That, independent of all positive law, governments have the right, on the principle of self-preservation.

The distinction taken, between public use and public benefit, does not seem to me, sustained by reason; nor has precedent attached a different meaning to the terms : in practical application, they are convertable terms. The right to appropriate private property to public use, is admitted; but the power is denied, for any public benefit. If, to make a thing of public use, from which a benefit is derived, it must be in the

continued occupancy of the agent of the government, or used as a public common; the case of condemning private property to public use, for the purpose of enabling an individual to erect a grist mill—one of the cases relied on in the argument, as an illustration of the powers of the legislature—would not be propitious to the object for which it was invoked. If there is a distinction in the terms, the case of the mill would be a public benefit, and not for public use. It is true, that the term "use," is employed in the latter clause of the thirteenth section of our declaration of rights. "Nor shall any person's property be taken, or applied to public use, unless just compensation be made therefor." But, it would be curtailing the sovereign power of the government, very much, indeed, to say, that, under this clause, in the declaration of rights, private property could not be appropriated to the public, without a continued occupancy of the thing appropriated. Whatever is beneficially employed for the community, is of public use, and a distinction cannot be tolerated.

The right of eminent domain, is always vested in the supreme authority of the State. Whatever the form of the government may be, the paramount right being in such supreme authority, its power to subject private property to public use, has never been questioned. In absolute despotisms, where the supreme authority is vested, without limitation, in one ruler, such individual ruler can subject the private property within his dominions, to the public use; and he is the sole judge of the expediency and necessity of the measure. In Great Britain, this authority is in the king and parliament. With us, it is primarially with the people, and it is exercised through

the agency of the representatives, assembled in a legislative capacity. But, with us, as in every other form of government, the sovereign power of the State must determine, not only whether the application of private property will be useful to the country, but the expediency of so applying it. And there is no maxim sounder, or of more universal application, than "that individual right must yield to the public good."

The sovereign authority is frequently exerted over personal rights and private property. It is done in the enforcement of all quarantine regulations—for the prevention of monopolies; and it is necessary, to prevent a correspondence with the public enemy. It is exercised by governments, as well in peace, as amidst the tumult of war—in time of peace, in opening harbors, dock yards, and channels of peaceful commerce, productive of the general prosperity of the country—in time of war, private property is more frequently subjected to the public use—for provisioning armies, supplying the means of transportation, and in the erection of fortifications. And, sometimes, it has been considered necessary to destroy every article of subsistance, and every thing that could, in any way, be subservient to the support and comfort of an invading army, for the purpose of arresting its progress. In such cases, infinite distress is produced by the destruction of private property; but the government acts on the principle of a right to sacrifice a part of the good of the many. If such measures have been resorted to, without the extreme case of all controlling necessity actually existing, it may be said, the government has acted unwisely and cruelly, to its suffering subjects; but the right cannot be questioned; and the expediency of such measure cannot be passed on

by any higher power, than public opinion. In most governments, private property is subjected to the use of the public, without any other guarantee to the owner, of a fair compensation or equivalent, than the confidence reposed, in the faith, and in the moral obligation of his government, or sovereign, to render every possible protection to the subject.

The sovereign power with us, has imposed a limition on itself, unknown to other sovereignties, except those of the American Union. It is declared, that, this right of using private property for public use, shall not be exercised, " without a just and fair compensation;" but there is no limitation on the right of determining the usefulness and the expediency of such appropriation. I need not surely refer to authority, in support of these inherent principles of government; were it necessary, it would be abundantly found in *Blackstone*, in *Vattel*, and in every other writer on the elements of law.

But it is said, that the " right of condemning private property, to the public use, is in no case the exercise of the law-making power;—that it is an act of sovereign power." I am not able to perceive the force of this objection—there seems to me to be an inconsistency in it. And I cannot comprehend a distinction, between sovereignty, and the law-making power. Sovereignty, shorne of this attribute, would be sovereignty no longer. There can be no higher exercise of sovereignty, or any act more expressive of its true character, than the legislative, or law-making. Law is a rule of action prescribed by the supreme authority in a state. An absolute prince would exercise this sovereign power, simply, by an expression of his will; because, to his subjects, his express will is their rule

of action.    In England, it is exercised by the king
and the two houses of parliament; with us, by the
governor, and the senate, and the house of represen-
tatives, in general assembly convened.    The people,
the source to which all power in this state may be
properly referred, have declared, by their constitu-
tion, that they will exercise this power of legislation,
in a particular mode, but their laws, when made un-
der the restriction, so prescribed, are, nevertheless, the
acts of supreme sovereign authority, unfettered by
any thing but its own limitations.    These restrictions
are imposed by the sovereign people, the fountain of
all legitimate authority, on themselves.    In figurative
language, they declare, so far will we go, and no fur-
ther; in this mode, and no other, will we exercise
the law-making power.    Should we, in our legisla-
tive capacity, attempt to transcend the restrictions
we have imposed on ourselves, we have prescribed a
remedy, for the control of such irregular exercise of
power : this check we repose in the judicial depart-
ment, and through those tribunals, still a part of our-
selves, will we declare the invalidity of such acts.

The second ground assumed in the argument, is,
that the charter is retrospective in its operation, in
this, that it takes away a vested right; and strong
objections have been urged against the power of the
legislature, to pass such laws.    It is contended, that
without any constitutional inhibition expressly impos-
ed, it is not to be presumed, that the framers of our
constitution ever designed vesting such power in the
legislature.

We are apt to use the term retrospective, as one of
similar import with ex post facto ; against the former,
there is no express prohibition : the constitution of

the United States restrains the States from passing laws of the latter description, and I apprehend that the proposition that no state can pass a retrospective law, is only true, *sub modo.*

If the retrospective act is to take away a right of property, or to dissolve the obligation of a contract, it would be unconstitutional and void. Not because it is retrospective, but the first would be not only repugnant to the fith article of the amended constitution of the United States, but also in violation of our own bill of rights. And the last would be in contravention of the article in the constitution of the U. States, that provides that no state shall pass a law, in violation of the obligation of contracts. But the legislature may pass an act, that in many respects, would be retrospective, and yet, its validity could not be questioned. The remedy may be changed, after a cause of action has accrued. The jurisdiction of the court, in which an action is cognizable, may be changed—the mode of securing testimony, or of enforcing a remedy, may be changed : in fine, it would be competent to make any modification in the *modus operandi* of prosecuting a suit. All these cases would, to some extent, be retrospective, because, that the law would operate on rights that previously existed.

In the case of *Dash* vs. *Vankleeck,*[a] an action was <sup>[a]</sup> brought against a sheriff for an escape. An act of the legislature was passed after issue had been joined, concerning escapes ; which would have had the effect to destroy the plaintiffs action. This act was attempted to be brought up in the defence, but the court decided that it could not control, or affect the plaintiffs right of action.

In the case of *Calder and Wife* v. *Bull and Wife*[b],

[a] 7 John.'s Rep. 477.

[b] 3 Dallas, 386.

the Court of Probates, had decided against the validity of a will, and the statute of limitations had interposed a bar to an appeal; the legislature of Connecticut, passed an act, setting aside the judgment, and authorising a re-hearing before the Court of Probates, with the liberty of an appeal within six months.—— The judgment of the court was then in favor of the will. On appeal to the Supreme Court of the United States, judgment was affirmed—Judge *Chase* holding that the act was not in contravention of either the constitution of the state of Connecticut, or that of the United States—*Iredell, Patterson* and *Cushing*, concurring. In this case, the Judges all held, that the prohibition against passing *ex post facto* laws applied to criminal, and not to civil cases. Judge *Chase* observes, that the "restraint against passing *ex post facto* laws, was not considered by the framers of the constitution, as extending to prohibit the depriving a citizen even of a vested right to property – or the provision that private property should not be taken for public use, without just compensation, was unnecessary."

I therefore conclude, that if a retrospective law, when applied to civil cases, takes away no vested right to property, it would not be unconstitutional. A distinction exists between a right of property, and a mere franchise or right to an office. One may be in the legal possession and enjoyment of a lucrative office, and the legislature may, notwithstanding his possession, abolish the office, and with the office, the profits or salary would fall. Or the incumbent to an office, for a term of years, may be ousted, and before he could be legally reinstated, the office may be abol-

ished; profitable rights would thus be affected by a retrospective law.

The third objection is, that the charter violates the third article of our constitution, which delares, that the three departments of government shall be kept separate.

It is contended, that the legislature assumed judicial powers in undertaking to seize the property, or enabling others to take it. The charter authorises a resort to the ordinary tribunals of the country, for the purpose of carrying into effect the objects of the incorporation. In this, there is certainly no encroachment on the judicial department. If the legislature had assumed in the charter to fix the valuation of any individual's land, and directed its appropriation to the use of the corporation, the objection would have been better founded—it would have had something more. the appearance of a judicial act.

The fourth objection is, that it violates the 9th section of the bill of rights, which secures persons and their possessions from unreasonable seizures. When the whole of this section is taken together, there can be no doubt, that its sole design and object was to protect the citizen, in person, and his private correspondence, from wanton and vexatious seizures and searches, made on slight and frivolous charges of criminal offences. And it cannot, by any fair construction, embrace the seizure and condemnation of private property to public use. If, however, it could be applied to a case of this kind, I am not prepared to say, that it would be an unreasonable seizure—so far to the contrary, it seems to me, that the circumstances would fully justify the measure.

The 5th objection is, that the charter is in viola-

tion of the last clause of the 10th section of our declaration of rights, which declares, that "no man shall be deprived of life, liberty, or property, without due course of law." This objection would cover the whole case. If the plaintiff has been deprived of his property, not according to the due course of law, the proceedings have not been legal, and should be reversed. It has been emphatically asked, if the due course of law, has been administered to the plaintiff in this case. If the legislature had no right to pass the act of incorporation, or if the forms of law it prescribes, have not been pursued, the answer must be in the negative.

The right to subject private property to public use, we have shown, belongs, to the supreme authority of the state, wherever, by the form of the government, it may be placed. And I trust, it has been satisfactorily shown, that in this state, it has been confided, by the people, to the legislature, under such restrictions as they have imposed by the constitution. Two questions, growing out of the last proposition of the plaintiff in error, will be considered.

1st. Is this case an appropriation of private property, to public use.

And 2d. If it is—has the charter sufficiently provided, that the owner shall receive a just and fair " compensation therefor."

Whenever the state grants a charter of incorporation, it is always presumed, that she receives for it some equivalent, that the grant is not without a *quid pro quo*. Sometimes, it is paid in a stipulated sum, by the corporators, as a *bonus:* And sometimes the equivalent sought by the legislature, is in the diffusion of some real, or supposed advantage, or facility

to the community at large, or to a portion thereof. If a particular neighborhood or town, is to be benefitted, it would as essentially characterize the measure, as a public benefit, as it would, if it were to be diffused over the whole state. And the amount or extent of public advantage to be derived, can only be considered by the legislature, in determining its sufficiency, to justify a resort, to the appropriation of private property, for effecting the object of the grant. It is on these principles, that a nuisance, in a neighborhood, however small and limited that neighborhood may be, can be legally abated. And the authority to establish all police regulations, may be traced to the same source.

In the state of New-York, they have a statute, by which, all persons owning mill dams, on streams running into lakes Champlain, Erie, and Ontario, which Salmon used to run up from these lakes, are required to keep open a slope, in their dam, so as to afford a free passage for the Salmon.

The object of the law, no doubt, was fonnded in good policy, and intended for the public good; but it will very readily be perceived, that in many cases, it would afford an advantage to a very small portion of a community, and this too, at the expense of private right, as but few comparatively, could enjoy the advantages of the Salmon fishery. The validity of this statute, was judicially tested in the case of *The People* vs. *Platt.*[a] Platt was the proprietor of a mill dam, on the Serenac, not far from its mouth; this stream is not considered a navigable stream; and as Platt was the owner of the land on both sides, if he could be restrained from erecting his dam in such way as he might think proper, it would be by force of the

[a] 17 Johns. 195.

statute in question.    The opinion of Chief Justice *Spencer* was, that the enforcement of the statute against Platt, would be in violation of the constitution, not on the ground of a too limited public benefit to be derived from the statute, but because no provision was made for allowing the owner a just compensation for his property.    So, in the great case of *Vanhorn* vs. *Dorrance*,[a] the claim-quieting statute of Pennsylvania, was ruled by Judge *Patterson*, to be unconstitutional, in as much, as it did not sufficiently provide for a just compensation to the owners.

[a] 2 Dallas,

The case of *Vanderbelt* vs. *Adams*,[b] was brought to recover a penalty for not obeying an order of the harbor master.    Vanderbelt was captain of the steamboat Thistle, lying at a wharf on the Hudson, and was ordered to move a certain space, to give a birth to the steam boat Legislator.    Vanderbelt was the owner of the wharf, and on this ground, disobeyed the order.    It was held, that notwithstanding he was the owner of the wharf, and in possession, yet he was nevertheless bound to submit to the regulations of the harbor, though no express compensation had been given him.    The temporary loss of the dominion over his property, was necessary to the public convenience.    The statute of our own state, giving a private way through the grounds of another, on the person applying for the same, making a just compensation to the owner, has been long submitted to.    And although it does not assume the authority of an adjudged case, yet the fact that it has never been questioned, is an argument in favor of its validity.    Within in the last three or four years, numerous charters, containing similar provisions, for condemning private property, have been granted, by I believe, nearly

[b] 7 Cowan, 349.

half the states of the American union, to rail road and canal companies.   And although it is not contended, that error sanctions error, we should be well convinced that those states have erred, before we are at liberty to discard the force of the argument, deduced from the fact, that such power has been exercised by those intelligent and patriotic legislative bodies; and that this power has never been judicially impugned. It is worthy of remark, that reference to the time, when those charters were granted, gives additional weight to the argument.   For if there ever was a time, when the powers of government were diligently and critically investigated, it is the period of the enactment of those charters.   It is a truth, that will not be controverted, that the whole history of the past ages presents no period of time when the powers of government have been subjected to as jealous and severe scrutiny, as the age in which we live.  The people know, and justly appreciate, not only their rights, but their own power ; and they are too diligent to permit them to be abridged by their rulers.   Virginia, the Alma Mater of Washington, of Henry, of Pendleton, of Wythe, and of Jefferson, and a host of other departed apostles of liberty, over whose names and memory, " time shall achieve no conquest"— Virginia, always on the watch tower, and ready to cry aloud and give the alarm, at the slightest encroachment on personal liberty and private right; she too, has within the last two years, granted several charters to rail road companies, containing precisely the same provisions.   And is Alabama, alone, to be arrested from indulging the public spirit of her citizens, and marching hand in hand with her sister states, in the great work of internal improvement, by

a conscientious jealousy of federal interference, on the one hand, and an inability to give efficiency to the efforts of public spirited individuals in the cause, on the other? That this grant of power to the corporation, was intended to be a public benefit, there can be no doubt. The prosperity of the corporators, is inseparable from that of the citizens, in the country where these powers are to be exercised. By adding to the convenience, wealth, and general prosperity of the community alone, can the stock of the company be rendered valuable. Limitations and restrictions have been imposed by the charter, on the exercise of these powers. A maximum of capital to be employed, and profit to be received on it, is prescribed. They were required to give notice of the opening of their books, to receive subscription for stock. They are required to permit the connection of lateral roads, and their existence is limited. The right of the land is not condemned—it remains with the proprietor—the use of it only is condemned for fifty years. All of these features on the face of the charter, prove that it was not made for the corporation or stockholders alone, but that it was a matter of much public interest. It only remains for me to enquire, if a sufficient provision has been made to secure to the owner a just compensation for his property, to be ascertained according to the due course of law.

The fifth section of the charter provides, "they shall be authorised to contract with and receive conveyances of any land, stone, or gravel, &c., which may be required in the construction of the said road; and when the owner and the company cannot agree as to its price; or, when the owner is an infant, *non compos mentis*, or non-resident; then it shall be law-

ful for the president and directors of the said compa-
ny, to apply to any justice of the peace for a war-
rant, directed to the sheriff of the county, command-
ing him to summon a jury of seven disinterested
free-holders, a majority of whom shall be authorised
to assess the damages, under the same rules and regu-
lations now established by law, in cases of other
roads: and the said jury shall, forthwith, assess the
value of the said land, gravel, timber, &c., subject to
the right of an appeal to the circuit court, by either
party who shall think themselves aggrieved. When
the trial be *de novo*, by a jury, as in other cases, and
the sheriff shall return the same into the office of the
clerk of the county court, of the proper county—and
at the next term of the commissioners court, the same
shall be affirmed, if no objection: and if the court
shall set the same aside, the said court shall order a
new writ, and the assessment made in pursuance
thereof, shall be final; and the land, stone, gravel,
timber, &c., so contracted for, or so condemned, shall
enure to the said company for fifty years, upon the
payment of the said money to the person so contract-
ed with, or into court, as the case may be : and the
whole proceedings shall be entered of record in the
said court, at the expense of the said company."

I wish this section of the charter borne in mind,
and compared with the provisions of the act of the
legislature of Pennsylvania, commonly called the
claim-quieting statute, for the relief of the settlers
under the Connecticut grant, to see how far the ob-
jections taken to the latter by Judge Patterson, ought
to prevail against this. Settlements had been made
within the chartered limits of the state of Pennsyl-
vania, by persons, under grants from Connecticut,

arising from a mistaken impression that the land
granted was within the province of Connecticut;
they were numerous in the county of Luzerne, and
were called the Connecticut settlers; and they had
been a long time in the peaceable possession of the
land.    The same had been granted to other persons,
by the original proprietors of the province of Penn-
sylvania.    For the purpose of protecting the Con-
necticut settlers against the Pennsylvania grantees,
the legislature of Pennsylvania passed the confirm-
ing and claim-quieting act, confirming to the Connec-
ticut settlers their right, and providing a compensa-
tion in lieu thereof, to the grantees under the original
proprietors of Pennsylvania.    It is to the compensa-
tory part of the act alone, that we should refer, as it
is that part of it only that I wish to compare with
the charter under consideration.    It is in the follow-
ing words: "And whereas the late proprietors, and
divers other persons, have heretofore acquired title to
parcels of the lands aforesaid, agreeably to the laws
and usages of Pennsylvania, and who will be depriv-
ed thereof by the operation of this act; and as jus-
tice requires that compensation be made for the lands
of which they shall thus be divested; and as the state
is possessed of other lands, in which an equivalent may
be made to the claimants under Pennsylvania, and
as it will be necessary that their claims should be as-
certained by a proper examination—Be it therefore
enacted, by the authority aforesaid, that all persons
having such claims to lands, that will be affected by
the operation of this act, shall be, and they are here-
by required by themselves, guardians, or other law-
ful agents, within twelve months from the passage of
this act, to present the same to the board of property,

therein clearly describing those lands, and stating the grounds of their claims, and also producing the proper proofs, not only of their titles, but the situations, qualities and value of the lands so claimed, to enable thd board to judge of the validity of their claims, and of the quantities of vacant lands proper to be granted as equivalents."

In the case of *Vanhorn's lessee* vs. *Dorrance,* the constitutionality of this act was subjected to a judicial enquiry, Judge *Patterson* in a most luminous opinion in which he displays, at least sufficient zeal, to protect private property from legislative action.    After discussing, with much ability and perspicuity, the nature and origin of the right of government, to subject private property to their use, admits the right, and also concedes the right of the governments, to determine on the exigency that will justify a resort, to the exercise of such power.    And he resolves his objections, to the constitutionality of the act, into the mode or manner in which a compensation for the land so taken, is to be ascertained, and the nature of the compensation itself.    He contends, with much force of argument, against the right of the legislature, to determine, by a board of property, chosen by itself, without the consent of the owner, the value of the land, and shows, it seems to me conclusively, that the valuation of the land could not be constitutionally ascertained, in any other way than by the intervention of an impartial jury.    The right of the board to try the validity of the claimant's title, was obnoxious to the same objection.    The learned Judge says, that compensation, in the sense in which the term is used in the constitution, can only be made in money— that money is the common standard, by a compari-

son, with which the value of any thing may be ascertained, that it is not only a sign which represents the respective value of commodities, but, is a universal medium, easily portable, liable to little variation, and readily exchanged for any kind of property ; finally, that compensation is a recompense in value, a *quid pro quo*, and must be in money.

It will be seen, by a reference to that part of the charter of the Tuscumbia, Courtland and Decatur rail road company, before quoted, that none of these objections will apply to the case before us.  The right of a trial by a jury, and that too, in the ordinary way in which private property is subjected to the use of roads, and the erection of mills is preserved.  The valuation is to be ascertained by a jury, with a right of appeal to the ordinary tribunals of justice  I therefore can see no objection to the validity of the act; the rights of individuals have been amply protected, and without the power exercised by the Legislature in granting the charter, there would be an end to all works of public improvement of this description, whether attempted to be conducted immediately by the state, or through the medium of corporate bodies, because any individual owning the smallest quantity of land, however inferior in value, over which the road would run, could interpose his veto : but fortunately for the community, no selfish individual can hold his government in check in this way.

We can see nothing in the technical objection, as to the manner in which the jury was sworn.

The judgment of the court below must be affirmed.