MURDOCK, Justice
(concurring in the result in case no. 1110439 and dissenting in case no. 1110507, as substituted on denial of applications for rehearing on September 27, 2013).
I concur in the result in case no. 1110439; I dissent in case no. 1110507. I write in reference to the latter case.
There are two issues in case no. 1110507: (1) the substantive meaning of the “takings clause” in § 23 of our State Constitution, specifically whether it prohibits “regulatory takings” without just compensation, and, (2) if it does, whether the takings clause in § 23 limits the power of municipalities. I will address both issues in the order stated.

I. The Substantive Meaning of § 23

The claim of inverse condemnation asserted by M & N Materials, Inc., under § 23 of the Alabama Constitution of 1901 was based not on a physical taking of the property at issue, but upon a so-called “regulatory taking” by the Town of Gurley (“the Town”). In case no. 1110507, the main opinion rejects this claim on the ground that
“it is clear, under the plain language of § 23 [Alabama Const. 1901] and under [this Court’s holding in] Willis [v. University of North Alabama, 826 So.2d 118 (Ala.2002) ], that the trial court properly held that § 23 does not apply in this case.... Willis makes clear that § 23 applies when a physical taking of the property in question has occurred.”
143 So.3d at 15. As discussed below, although Willis may hold that § 23 does apply when there has been a physical taking, it should not be read as holding that this is the only circumstance in which § 23 applies. In any event, the present case is distinguishable from Willis. Further, as also discussed below, I do not agree that the plain language of § 23 forecloses compensation for a so-called “regulatory taking” of property by the government.
A. Distinguishing Willis
I agree that the Court in Willis did rely upon the lack of a physical taking as a basis for ruling against the landowner in that particular case. 826 So.2d at 121. That was the only rationale offered to the Court by the government in that case, however. Id. Moreover, the Court’s reliance upon this rationale to decide the particular case before it must be considered in *19 light of the juxtaposed rationales offered to the Court by the parties in that case. The alternative position offered to the Court by the landowner was that governmental action that resulted in a mere “injury” to property, as opposed to an outright physical taking of it, was sufficient to sustain a claim of inverse condemnation under § 23. Id. The Court’s opinion, therefore, understandably rejects the landowner’s argument and embraces the position that mere “injury” to property does not violate the right expressed in § 23. Importantly for our purposes here, no issue was presented in Willis as to whether a “regulatory taking” would be prohibited by § 23.
Willis involved the construction of a parking deck by the government on property adjacent to the plaintiffs. The plaintiff complained that the presence of this structure resulted in a reduction in the market value of the plaintiffs property and, thus, that his property had been “injured” for purposes of § 23. 826 So.2d at 120. Willis did not involve, as does the present case, a regulatory action by which the government directly and formally imposed restrictions upon the use of the plaintiffs property. Nor did the plaintiff argue that the government’s actions had deprived his property of all reasonable uses.[10] Accordingly, I cannot find Willis to be dispositive of the issue of the potential application of § 23 in the present case.[11]

B. Comparing the “Takings Clause” of § 23 of the Alabama Constitution and the “Takings Clause” of the Fifth Amendment to the United States Constitution

The applicable “takings clause” of § 23 reads as follows: “[Pjrivate property shall not be taken for, or applied to public use, unless just compensation be first made therefor.... ” The “Takings Clause” of the Fifth Amendment to the United States *20 Constitution states that private property shall not “be taken for public use, without just compensation.” I see no material difference in the wording of these two provisions.
As this Court has recognized:
“[W]hen the United States Supreme Court construes the Federal Constitution and its application to a given situation, it is controlling on us insofar as that constitution is concerned. When we construe similar features of the State Constitution as applicable to the same situation the decision of the United States court, though not controlling on us[] should be persuasive. A different conclusion would produce much confusion and instability in legislative effectiveness.”
Pickett v. Matthews, 238 Ala. 542, 547, 192 So. 261, 265-66 (1939). This Court often looks to federal constitutional cases when considering the meaning of a particular word in a constitutional context. See, e.g., Cole v. Riley, 989 So.2d 1001, 1009-10 (Ala.2007) (See, J., concurring specially); Jefferson Cnty. v. Southern Natural Gas Co., 621 So.2d 1282, 1287 (Ala.1993) (looking to United States Supreme Court cases to draw a distinction between inverse condemnation and eminent domain).
The United States Supreme Court has held that “government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster — and that such ‘regulatory takings’ may be compensable under the Fifth Amendment.” Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). As Justice Holmes explained in his watershed decision in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922): “[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.”
Furthermore, insofar as a taking for “public use” is required, there is no dispute that the zoning of the land at issue here in order to prevent its use as a quarry was done for the purported benefit of the Town and the public at large. Takings jurisprudence in both the federal and the state courts emphasizes the need to “bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); City Council of Montgomery v. Maddox, 89 Ala. 181, 188-89, 7 So. 433, 436 (1890). “Whatever is beneficially employed for the community is of public use and a distinction [between this and ‘public benefit’] cannot be tolerated.” Aldridge v. Tuscumbia, C. & D.R. Co., 2 Stew. & P. 199 (Ala.1832).
This is not the first case in which this Court has had the opportunity to discuss federal “regulatory taking” jurisprudence in the context of a claim under § 23 of the Alabama Constitution. In Alabama Department of Transportation v. Land Energy, Ltd., 886 So.2d 787 (Ala.2004), the Court affirmed an inverse-condemnation award under § 23 of the Alabama Constitution based on a “taking” of surface-mine-able coal. In so doing, the Court relied upon the doctrine of law of the case in relation to a failure of the State (specifically, the Alabama Department of Transportation (“ADOT”)) to object at trial to a jury instruction that the plaintiff was entitled to recover for a “taking” if the jury found that the actions of the State had prevented the plaintiff from mining the coal from its property. Indeed, ADOT committed itself in that case to a position that a “taking” could occur for purposes of § 23 by a so-called “regulatory taking.” *21 886 So.2d at 799. Accordingly, this Court provided the following explanation of ADOT’s position in that case, helpful to the present case because of its instructive discussion of federal “regulatory taking” jurisprudence:
“ADOT ... state[s] that
“ ‘there are two distinct kinds of taking: physical takings and regulatory takings. A physical taking requires a physical invasion or occupation of the property or that the owner be otherwise dispossessed of the property. A regulatory taking occurs where the owner retains the property, but its use is now regulated to such a degree that it is the legal equivalent of a taking. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003,112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).’
“ADOT further asserts that the ‘takings jurisprudence of the U.S. Supreme Court has recognized two types of com-pensable regulatory takings: Categorical and partial.’ It contends that a categorical taking is one in which all economically viable use, meaning all economic value, has been absorbed by the regulatory imposition. By process of elimination, it concludes that the alleged taking in this case must be analyzed as a ‘partial’ taking that is ‘regulatory in nature’ because LE’s claim, which relates only to ‘a portion of the mineral estate, i.e., the surface mineable coal, prevents any conclusion that a categorical taking of the 120-acre mineral estate occurred.’ Thus, in accordance with the legal position ADOT has staked out, this Court must consider whether there was substantial evidence from which the jury could reasonably have concluded that either a full or a partial taking occurred. Citing Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), ADOT argues that ‘[t]he point at which regulation becomes a partial taking does not present a bright line test, but rather an ad hoc balancing test focused on (1) distinct investment backed expectations, (2) the nature of the government action, and (3) the economic impact on the property owner.’ ”
Land Energy, 886 So.2d at 797. The Court also noted that, “[w]ith respect to ‘regulatory takings,’ ADOT referred in its trial brief to ‘a growing body of federal law involving the issue,’ citing six decisions of the United States Supreme Court, including Penn Central, supra; Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); and Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).” 886 So.2d at 798. Further, citing Lucas, ADOT took the position that “ ‘[a] regulatory taking occurs where the owner retains the property, but its use is now regulated to such a degree that it is the legal equivalent of a taking.’ ” Id.
The Court’s opinion in Land Energy went on to explain as follows:
“In Penn Central, supra, the United States Supreme Court acknowledged that it had theretofore been unable to develop any set formula for determining when compensation for a regulatory taking was due from the government, explaining that the cases on point had engaged in ‘essentially ad hoc, factual inquiries.’ Among the factors prior caselaw had identified as having particular significance in the analysis was ‘[tjhe economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.’ 438 U.S. at 124, 98 S.Ct. 2646, 57 L.Ed.2d 631. In Lucas, the Court ac *22 knowledged that its easelaw had produced some ‘inconsistent pronouncements.’ 505 U.S. at 1016 n. 7, 112 S.Ct. 2886, 120 L.Ed.2d 798. The Court pointed out that it had said on numerous occasions ‘[that] the Fifth Amendment is violated when land-use regulation ... “denies an owner economically viable use of his land.” ’ 505 U.S. at 1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (quoting Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)) (emphasis added in Lucas)....
“In Tahoe-Sierra Preservation Council, supra, the Court explained that ‘[t]he Penn Central analysis involves “a complex of factors including the regulation’s economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.” ’ 535 U.S. at 315 n. 10, 122 S.Ct. 1465,152 L.Ed.2d 517 (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 616, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)). The phrase actually used in Penn Central was ‘distinct investment-backed expectations.’ Penn Central cited Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), as the source of this factor, but no phrasing similar to it is used at the page cited or anywhere else in the Goldblatt opinion. The relevant statements that appear on the page cited from Goldblatt are simply that ‘[t]here is no set formula to determine where regulation ends and taking begins’; that a ‘comparison of values before and after is relevant,’ but ‘by no means conclusive’; and that ‘[h]ow far regulation may go before it becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question’ (footnote omitted).[3]
[[Image here]]
“[3] Penn Central commented that ‘[i]t is, of course, implicit in Goldblatt that a use restriction on real property may constitute a “taking” ... perhaps if it has an unduly harsh impact upon the owner’s use of the property.’ 438 U.S. at 127, 98 S.Ct. 2646, 57 L.Ed.2d 631.”
Land Energy, 886 So.2d at 798.
The Court ended its analysis of the issue with an extensive review of the trial testimony relevant to the landowner’s “reasonable expectation of a return on investment.” 866 So.2d at 799-803. Based on this evidence, it concluded that the landowner had been deprived of an “identifiable property-use interest” within the context of the regulatory-taking jurisprudence applicable to that case. 866 So.2d at 802-03.
Although we are not bound by the federal regulatory jurisprudence relied upon by the Court in Land Energy, I am persuaded that we should apply some form of it to § 23 claims, given the virtually identical language of that section of our State constitution and of the Fifth Amendment to the United States Constitution. In this case, there is ample evidence from which the jury could have concluded that the property was suited primarily for mining the stone beneath its surface and not for the agricultural purpose for which it was zoned and that, as a result, there has been an “unduly harsh impact upon the owner’s use of the property.” 866 So.2d at 798. More specifically, the owner in this case has been deprived of any and all reasonable uses of its property and, concomitantly, of a distinct and “reasonable investment-backed expectation.” I therefore find the Town’s actions to have been a regulatory taking that is prohibited by § 23 in the absence of adequate compensation.

*23
II. The Takings Clause of § 23 Does Limit Municipalities (And § 235 Does Not Dictate Otherwise)

Two provisions of the Alabama Constitution of 1901 are germane to the issue before us, §§ 235 and 28. To the extent that the Town argues that § 28 does not apply to takings by municipal corporations because § 235 instead applies, I do not follow the Town’s logic. It is true that § 235 does apply to municipal corporations. This does not mean, however, that § 23 does not also apply to them. For the reasons discussed in more detail in Part H.B., below, § 23 prevents a municipal corporation from taking private property without compensating the landowner therefor. Before turning to § 23 per se, however, I will first address the provisions of § 235.

A. Section 235 Does Not Empower Municipalities to Take Property for Reasons Other than Constructing “Public Works" Without Compensating the Landowner

The first critical point to be made concerning § 235 is that § 235 is not the source of municipalities’ power to take property. That is, § 235 is not the provision that creates or defines the nature of that power in municipalities. The first sentence of § 235 simply begins with the following reference: “Municipal ... corporations ... invested with the privilege of taking property for public use.... ” This language presumes that power to take property of some nature already has been “invested” in a municipality apart from § 235 itself. (The source of the power in municipalities is discussed below.)
Accordingly, and this second point is closely tied to the first, the fact that § 235 then continues by expressing limitations or conditions (the payment of compensation) on certain uses of that power (the “construction or enlargement of [the municipal corporation’s] works, highways, or improvements”) is no basis for concluding that the referenced uses are the only possible uses of the power of eminent domain by a municipality. It means only that these are the uses of the power of eminent domain as to which the drafters of § 235 chose to reiterate a limitation on municipalities in that section, probably because the more general limitations imposed by § 23 (as discussed below) were also in place and the uses referenced in § 235 were the most commonly used purposes of eminent domain by municipalities at that time. See note 13, infra.[12]
In other words, if, consistent with the discussion in Part I of this writing, we accept the general notion that “taking” of private property can entail more than just the physical taking of property (i.e., a taking for “the construction or enlargement” of public works as addressed in § 235), then it is important to recognize what § 235 does and does not say regarding those types of taking that it does address. What § 235 does say is that there is an affirmative obligation on the part of a municipal corporation to pay compensation whenever it does take or destroy property for the construction or enlargement of a public-works project. What § 235 does not say is that a municipal corporation can take or destroy private property only for the construction or enlargement of public-works projects or, more importantly, that if in fact a municipality does take *24 or destroy private property for some purpose other than for the construction or enlargement of a public-works project, it need not worry about compensating the landowner for that taking.
In his discussion of the relationship of §§ 235 and 23, however, Justice Parker contends that an understanding of § 23 as limiting the authority of municipalities would be contrary to the principle that §§23 and 235 should be read in pari materia. 143 So.3d at 48 (Parker, J., concurring specially). I find the converse to be true. The limitations on municipal action expressed in § 235 are entirely consistent with the understanding that § 23 recognizes the rights of private landowners and a corresponding right to just compensation when their property is “taken” by force of governmental action. As discussed above, § 235 simply makes clear that there is in fact a right to receive compensation when the taking is by a municipality for a public-works project, this more than likely being the purpose for which it was anticipated in 1901 that a municipality would take a citizen’s property.[13] A reading of this affirmative language as somehow negating the right to receive compensation in any circumstance not described therein would be the reading that would conflict with the plain language of § 23 and that would run counter to the principle of reading the two provisions in pari materia. The specific provisions of § 235 do not negate the more general protection afforded by § 23 to the citizens of this State against the “general power of government” to take their property without compensation.
Section 23 is part of Article I of the Alabama Constitution, an Article entitled “Declaration of Rights.” A reading of § 235 that blocks the application of § 23 to takings by municipal corporations also runs counter to the assurance in another provision of that “Declaration of Rights,” specifically § 36, that the rights recognized by that Declaration will be held “inviolate” against “the general power of government”:
“[T]he enumeration of certain rights [in Article I] shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general power of government, and shall forever remain inviolate.”
(Emphasis added.)
I therefore must conclude that what we have in § 235 is simply a more specific assurance of the right to compensation from a municipality when it acts in certain ways or, as Justice Parker puts it, “a further limitation upon the eminent-domain power” that is “specifically applicable to corporations, including municipal corporations.” 143 So.3d at 47.
In an effort to support the view that § 235 applies to municipal corporations to the exclusion of § 23, however, Justice Parker relies upon the 1911 case of Duy v. Alabama Western R.R., 175 Ala. 162, 57 So. 724 (1911). Specifically, he infers from *25 the analysis in Duy that § 23 applies only to the State. I do not read Duy as so holding.
The only question under consideration in the portion of Duy quoted by Justice Parker was what limitations on taking are imposed by the Constitution against the State:
“As to the state itself, the sole restraint in the particular now important is Const. § 28, wherein it is provided that ‘private property shall not be taken for, or applied to, public use, unless just compensation be first made therefor.’ Section 235 is addressed to the restraint of ‘municipal and other corporations and individuals invested with the privilege of taking property for public use.’ This latter section [235] does not apply to the state itself in the exercise of its sovereign power in restraint of which, in so far as we are now concerned, Const. § 23, alone operates.”
175 Ala. at 173-75, 57 So. at 727-28. The quoted passage correctly notes that, as between §§ 23 and 235, the only passage that applies to the State is § 23. The fact that § 235 does not apply to the State, however, does not mean that § 23 does not apply to municipalities, and the passage quoted from Duy certainly does not say that it does.
In short, there is nothing in the language of § 235 that deprives landowners of the fundamental right guaranteed by § 23 of the Constitution merely because the governmental entity doing the “taking” is a municipal corporation. Moreover, for the various reasons discussed below, the rights expressed in § 23 and the limitations on governmental power that inherently correspond to those rights clearly do apply to “takings” by municipal corporations.

B. Section 23 Limits Municipal Corporations

1. The Intrinsically Limited Nature of the Power

Section 23 of the Alabama Constitution, in its entirety, reads:
“That the exercise of the right of eminent domain shall never be abridged nor so construed as to prevent the legislature from taking the property and franchises of incorporated companies, and subjecting them to public use in the same manner in which the property and franchises of individuals are taken and subjected; but private property shall not be taken for, or applied to public use, unless just compensation be first made therefor; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner; provided, however, the legislature may by law secure to persons or corporations the right of way over the lands of other persons or corporations, and by general laws provide for and regulate the exercise by persons and corporations of the rights herein reserved; but just compensation shall, in all cases, be first made to the owner; and, provided, that the right of eminent domain shall not be so construed as to allow taxation or forced subscription for the benefit of railroads or any other kind of corporations, other than municipal, or for the benefit of any individual or association.”
(Emphasis added.)
It is contended that § 23 does not apply to municipalities because of the two references to “the legislature” in the first and fourth clauses of § 23. It is clear, however, that these references do not mean that the power to take property, when exercised by a municipality, is somehow less subject to the limitations expressed in the above-emphasized “takings clause” than *26 when that power is exercised by the legislature itself. Specifically, it is clear that the limitations of § 23 are intended, in the words of § 36 discussed above, as limitations on “the general powers of government.” That is, the term “legislature” must be treated as a reference to the State itself (much like the word “Congress” in the First Amendment to the United States Constitution[14] is treated as a reference to the federal government generally[15]).
Moreover, the use of a reference to “the legislature” in reference to restrictions on the power of the State to take private property is particularly appropriate because of the intrinsically legislative nature of that power. Although that power to take private property does belong to the State as a sovereign entity, the specific repository of that power within the State is in fact “the legislature.” The legislature may vest some other agency of the government or some political subdivision with the power, but when it does so it is a portion of the legislature’s power that is being vested. Excluding the federal government, there is no other power to take property. The power that is held by the legislature is the whole of it.
“The power of eminent domain belongs exclusively to the legislative branch. The mode and manner of the exercise of the power of eminent domain is exclusively vested in the judgment and discretion of the legislature, exercised through entities or individuals authorized by statute. The executive branch of the government cannot, without the authority of some statute, proceed to condemn property for its own uses. Likewise, the judiciary can not exercise eminent domain, although it-may rearrange property rights in accordance with the law without it being a taking of property.”
26 Am.Jur.2d Eminent Domain § 5 (footnotes omitted). See also, e.g., Green St. Ass’n v. Daley, 373 F.2d 1, 6 (7th Cir.1967) (“The power of eminent domain is legislative in character.”).
Section 23 defines a limitation on this power of eminent domain held by the State through its legislature. This Court set forth the following concerning the power of eminent domain and its limitations in Gober v. Stubbs, 682 So.2d 430, 433-34 (Ala.1996):
“The power of eminent domain does not originate in Article I, § 23. Instead, it is a power inherent in every sovereign state. Section 23 merely places certain limits on the exercise of the power of eminent domain. This Court stated in Steele v. County Commissioners, 83 Ala. 304, 305, 3 So. 761, 762 (1887):
“ ‘The right of eminent domain antedates constitutions, and is an incident of sovereignty, inherent in, and belonging to every sovereign State. The only qualification of the [inherent] right is, that the use for which private property may be taken shall be public.... The constitution [of our State] did not assume to confer the power of eminent domain, but, recognizing its existence, [further] limited its exercise by requiring that just compensation shall be made.’ ”
(Emphasis added.)
Accordingly, if the power of eminent domain held by the State and reposited in *27 the legislature is characterized by some limitation, then, by definition, some portion of that power given by the legislature to another entity is characterized by that same limitation. Again, the power held in the first instance by the legislature is the whole of the power of eminent domain in the State of Alabama. There is no other. The power given to a political subdivision, including as in this case a municipal corporation, is but a portion of the same power that resides in the legislature. See generally, e.g., Peak v. City of Tuscaloosa, 73 So.3d 5, 16 (Ala.Crim.App.2011) (“Municipal corporations both possess and exercise two kinds of functions and powers, one governmental and the other proprietary or business.... The one is a part of the sovereign power of the state, delegated by the Legislature.” (emphasis added)); Cooper v. Town of Valley Head, 212 Ala. 125, 126, 101 So. 874, 875 (1924) (explaining that, “in the exercise of the police powers conferred thereon, [a municipal corporation] is essentially a public agency, a local unit of government, invested with a portion of the sovereign power of the state, for the benefit of its inhabitants” (emphasis added)).[16] If that power is limited in the hands of the State, then so it is in the hands of a municipality.

2. The Limited Nature of Municipalities

All of this may also be viewed from the slightly different perspective that a municipality is a creature of the State (and specifically of the legislature) that has no inherent power of its own, but only that power the legislature gives it.[17] The State of Alabama (or our legislature, if one prefers) therefore cannot confer upon a municipality, as a political subdivision of its creation, some authority or ability to act in relation to the State’s citizens that the State, the creating entity, itself does not possess.
" 'A municipal corporation is but a creature of the State, existing under and by virtue of authority and power granted by the State.’ Hurvich v. City of Birmingham, 35 Ala.App. 341, 343, 46 So.2d 577, 579 (1950). A municipality 'derives all of its power from the state, and no municipality can legislate beyond what the state has either expressly or impliedly authorized.’ Arrington v. Associated Gen. Contractors of America, 403 So.2d 893, 902 (Ala.1981). Put another way, '[mjunicipal corporations may exercise only such powers as are expressly granted to them by the Legislature or necessarily implied in or incident to the powers expressly conferred, and those indispensably necessary to the accomplishment of the objects of the municipality.’ Phenix City v. Putnam, 268 Ala. 661, 664, 109 So.2d 836, 838 (1959).”
Peak v. City of Tuscaloosa, 73 So.3d 5, 12 (Ala.Crim.App.2011). Thus, "[a] municipal corporation has no inherent power of eminent domain, and can exercise it only when expressly authorized by the legislature....” City of Birmingham v. Brown, 241 Ala. 203, 207, 2 So.2d 305, 308 (1941) (emphasis added).
*28 “[C]ities are political subdivisions of the state, each created by the sovereign power of the state, in accordance with the sovereign will, and each exercising such power, and only such power, as is conferred upon it by law....
“... ‘Every power which is possessed by a municipality is a power which is delegated to it by the state....’”
Yeilding v. State ex rel. Wilkinson, 232 Ala. 292, 295, 167 So. 580, 582 (1936) (quoting State ex rel. Wilkinson v. Lane, 181 Ala. 646, 62 So. 31, 34 (1913)). Moreover, as the Court in Yeilding continued:
“This statement of the law by this court in [Wilkinson u] Lane[, 181 Ala. 646, 62 So. 31 (1913) ], finds direct and full support in the following statement of the rule found in 43 Corpus Juris, p. 76, § 15: ‘A municipal corporation can have no other source than the sovereign power; its creation is an attribute of sovereignty. [A municipal corporation] is a political creature, and the creature cannot be greater than its creator. Certain sovereign powers, such as legislative power, and the power of eminent domain, are conferred on a municipal corporation, and nothing less than sovereign power can confer the supreme faculties upon any creature; nor can he who has no sovereign power confer any.’ ”
Yeilding, 232 Ala. at 295-96,167 So. at 582 (emphasis added). See also id., 232 Ala. at 297, 167 So. at 584 (referring to the power of the legislature to delegate non-legislative powers “which it may itself rightfully exercise.”[18]
“A legislature may delegate part of its power over local matters to local governments. The delegation of legislative power with respect to the control of municipalities is subject to the usual conditions and limitations, including that a municipality may not be vested with powers that the legislature itself does not possess, and local legislation that conflicts with the general law of the state is void.”
56 Am Jur.2d Mun. Corp. § 90 (2013) (emphasis added).
The legislature of Alabama has conferred upon the Town a portion of the State’s power to zone property[19] and a portion of the State’s power to take private property for public purposes.[20] As discussed in Part I, neither of these powers in the hands of the State could be used to *29 accomplish an uncompensated “regulatory taking” of M & N’s property. Neither can they be so used by the Town.

3. Our Cases Apply § 23 to Municipalities

Consistent with all the foregoing, in a case relied upon by the Town in its brief to this Court and characterized by the Town itself as a § 23 case, the Alabama Court of Civil Appeals recognized that “Article I, § 23, Ala. Const. (1901), requires that before a municipality may take private property for public use, it must pay just compensation to the property owner.” Parrish v. City of Bayou La Batre, 581 So.2d 1101, 1102 (Ala.Civ.App.1990) (relying on § 23 to uphold a municipality’s exercise of its power of eminent domain). See also Opinion of the Justices No. 155, 264 Ala. 452, 88 So.2d 778 (1956) (providing advisory opinion to the Governor of the State of Alabama in a manner that contemplated the applicability of § 23 of the Alabama Constitution to municipalities); Chichester v. Kroman, 221 Ala. 203, 128 So. 166 (1930) (discussing § 23 and making no distinction between the restraint it places on the State and the restraint it places on municipal corporations). See also City of Dothan v. Wilkes, 269 Ala. 444, 114 So.2d 237 (1959) (citing both §§ 23 and 235 as “constitutional ... provisions relating to eminent domain [that] comprehend compensation for damage to property” taken by a municipality for purposes of constructing a public roadway); Blankenship v. City of Decatur, 269 Ala. 670, 115 So.2d 459 (1959) (treating § 23 as the applicable provision governing the legality of an alleged taking by a municipality of private property); Jones v. City of Huntsville, 47 Ala.App. 595, 259 So.2d 277 (Ala.Civ.App. 1971) (measuring sewer assessment imposed by the City of Huntsville against the restrictions of imposed by § 23).

III. Conclusion

Under § 23, the State cannot do indirectly by regulation what it cannot do directly by a physical taking. If, notwithstanding the purported protection of the rights of landowners and the corresponding limitation on State action as expressed in § 23, the State can create a political subdivision with the power to act free of those limitations, then the purported recognition of those rights and the purported assurance in § 36 that those rights will be held “inviolate” against “the general powers of government” are hollow.
For the reasons discussed above, I respectfully dissent.

. I do not address the issue whether a regulatory taking necessarily occurs only when property is deprived of all reasonable uses, only the fact that that is what occurred in this case. See discussion, infra, of Alabama Department of Transportation v. Land Energy, Ltd., 886 So.2d 787 (Ala.2004), noting with apparent approval United States Supreme Court jurisprudence recognizing the possibility of a regulatory "partial taking."

. In his separate writing, Justice Parker expresses the view that this writing "does not address the significant holding in Willis overruling in part Foreman v. State, 676 So.2d 303 (Ala. 1995).’’ 143 So.3d at 45 (Parker, J., concurring specially). I disagree. I believe I have adequately explained the limited nature of the Willis holding. Specifically, however, Justice Parker focuses on the overruling in Willis of the holding in Foreman that " ‘a governmental authority need only occupy or injure the property in question.' ” 143 So.3d at 44 (quoting Foreman, 676 So.2d at 305 (emphasis by Justice Parker)). He suggests thereby that Willis stands for the proposition that a mere "injury” is not enough to constitute a "taking” under § 23. I stand by the factual distinctions between the present case and Willis, as described in the preceding text, as well as by my explanation of the limited nature of the Willis holding given the context of those facts and the competing positions offered to the Court by the parties in that case. The Willis Court said that a physical occupation of the property was compensable; it did not say, as Justice Parker suggests, that "anything other than physical invasion is not compensable." 143 So.3d at 45. In short, the issue of a "regulatory taking" simply was not presented to or addressed by the Court in Willis. As I explain in the text immediately following this footnote, what is going on in this case is more than a mere "injury” to property of the nature rejected in Willis (the construction of a parking deck next to the landowner’s property). Instead, there is a regulatory taking that deprives the property of all reasonable uses, including particularly the "reasonable investment-backed expectations” of its owner. See Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

. Of course, if this Court considers the purposes specified in § 235 as the only purposes for which a municipality is permitted to take property, then the Town is in no better position as a result. If in fact, as discussed in Part I of this writing, the Town’s actions did in fact constitute a "taking,” the purpose for which that taking occurred in this case was not one of the purposes that the Court will have found to be authorized by § 235.

. As Justice Parker notes, municipal zoning ordinances did not come into vogue until the early 1900s. Therefore, "[i]n 1901 ... the threat of regulatory 'takings' of property through a municipality’s authority to pass zoning regulations wan not an obvious threat to an individual's property rights,” 143 So.3d at 35, as was the threat of a physical taking for use in a public-works project. The threat of the latter would explain the decision of the drafters of the Constitution to provide the additional, specific layer of protection articulated in § 235. Understandably, as well, the specific matters addressed in § 235 were not appropriate to the more general "declaration of [individual] rights” and corresponding limitation on governmental power to take property as expressed in § 23.

. This principle is so fundamental as to predate our existing Constitution:
" 'There is, nevertheless, one clearly-defined exception to the rule that the legislature shall not delegate any portion of its authority. The exception, however, is strictly in harmony with the general features of our political system, and it rests upon an implication of popular assent which is conclusive. The exception relates to the case of municipal corporations. Such corporations being considered parts of the machinery of the government, governmental agencies necessary and most effective to manage the local affairs of the people residing in the designated locality, by custom immemorial a portion of the political powers of the state has been delegated to them, to be exercised in local administrations; and the authority to delegate, if not expressly incorporated in the constitution, may be regarded as clearly implied.’ "
Schultes v. Eberly, 82 Ala. 242, 244-45, 2 So. 345, 347 (1887) (quoting with approval Cooley on Tax. 63) (emphasis added).

.

. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.”

. Justice Parker agrees that "the Declaration of Rights set forth in Article I, including the limitations on the power of eminent domain in § 23, applies to the State generally, not only to the legislature.” 143 So.3d at 47.

.See also Johnston v. Alabama Pub. Serv. Comm’n, 287 Ala. 417, 420, 252 So.2d 75, 77-78 (1971):
"[I]n exercising the power, [the legislature] can select such agencies as it pleases, and confer upon them the right to take private property subject only to the limitations contained in the Constitution. Accordingly it has been held that the right may be conferred upon corporations, public or private, upon individuals, upon foreign corporations, or a consolidated company composed in part of a foreign corporation, and upon the federal government. Such has been the common practice since the Revolution, and the right to do so has never been a matter of serious question; and it may be regarded as settled law that, in the absence of special constitutional restriction, it is solely for the Legislature to judge what persons, corporations or other agencies may properly be clothed with this power.”
(Emphasis added.) (Elsewhere, the Court in Johnston posited that the term "confer,” rather than “delegate,” was appropriate, given the Court's concern that the notion of "delegating” power connoted a "divesting” of power by a sovereign, something a sovereign cannot do. 287 Ala. at 420-21, 252 So.2d at 77-78. It appears that the authorities that use the term "delegate” do so without intending to suggest anything more than a sharing by the delegating authority of some power it possesses.)

. See § 11-52-70, Ala.Code 1975.

. See § 11-47-170, Ala.Code 1975.

. Although our current Constitution was ratified in 1901, the antecedent to § 235 is Art. XIV, § 7, Ala. Const. 1875, which stated: